Goodner v. Goodner.

GEORGE W. GOODNER *v.* SARAH E. GOODNER.* .

(*Nashville.* December Term, 1922.)

1. **APPEAL AND ERROR.** Pleas stricken from files in trial court sufficiently preserved where incorporated in defendant's motion for new trial and copied in full in minute entry.

In an action for breach of marriage promise brought by a divorced woman against her former husband, where error was assigned on appeal to the action of the trial court in striking defendant's pleas from the file for insufficiency, the fact that such pleas were not made part of the bill of exceptions did not prevent defendant from raising the question of error, where the pleas were incorporated *in haec verba* in defendant's motion for new trial, which motion in turn was copied in full in the minute entry, which was sufficient to preserve the pleas. (*Post, pp.* 521-531.)

Cases cited and approved: Deane v. Aveling, 1 Robertson, 279; Payne v. Payne, 46 Minn., 467; W. v. H., 2 Swabey & Tristram, 240; Sanders v. Coleman, 97 Va., 690; Smith v. Compton, 67 N. J. Law, 548; Allen v. Baker, 86 N. C., 91; Gring v. Lerch, 112 Pa., 244; Gulick v. Gulick, 41 N. J. Law, 13.

Cases cited and distingushed: Hall v. Wright, Ellis, Blackburn & Ellis, 746; Shackleford v. Hamilton, 93 Ky., 80.

Code cited and construed: Sec. 2448, subsec. 1 (1858); Sec. 4201 (S.)

2. **TRIAL.** Instruction as to defense of impotency properly refused as abstract and is ignoring evidence.

In a suit for breach of promise of marriage brought by a divorced woman of forty-nine against her former husband, who was sixty-six years old, and who interposed natural impotency as a defense, it was not error to refuse to instruct as to the functions of sexual intercourse in marriage, and that, if defendant was impotent to plaintiff's knowledge, she could not recover, even though there

---

*On measure of damages for breach of promise to marry see note in 41 L. R. A. (N. S.), 840.

was a contract of marriage and that it had been breached, such instruction being abstract and ignoring the ages of the parties and the fact that they had cohabited as husband and wife for more than twenty years. (*Post, pp.* 531-536.)

Cases cited and approved: Shafto v. Shafto, 28 N. J. Eq., 34; Brown v. Brown, 1 Hagg., 524; Shackleford v. Hamilton, 93 Ky., 80.

Cases cited and distinguished: Hatch v. Hatch, 58 Misc. Rep., 54; Briggs v. Morgan, 3 Phill., 325; W. v. R., 1 Probate Division, 405.

3. **BREACH OF MARRIAGE PROMISE.** Natural impotency held no defense where parties had formerly been husband and wife.

In a suit for breach of promise of marriage brought by a divorced woman against her former husband, it was no defense that defendant was naturally impotent, and that plaintiff knew it, since if plaintiff, who had lived with him for twenty-three years, was willing to make another attempt and had promised to marry him again, it was not for him to repudiate his promise on account of his physical incapacity, notwithstanding that Code 1858, section 2448, subsection 1, makes natural impotency a cause for divorce. (*Post, pp.* 536, 537.)

Case cited and distinguished: A. v. B., 1 Probate & Divorce, 559.

4. **BREACH OF MARRIAGE PROMISE.** $1,000 held not excess for breach of marriage promise.

$1,000 *held* not so excessive as to indicate passion, prejudice, and caprice on the part of the jury in an award to plaintiff suing her former husband for breach of promise of marriage, she being forty-nine years old and defendant sixty-six, notwithstanding evidence of defendant's worthlessness as a husband. (*Post, pp.* 537, 539.)

Cases cited and approved: Railroad Co. v. Moriarity, 135 Tenn., 446; Grant v. L. & N. Ry. Co., 129 Tenn., 398; Carolina, etc., R. R. Co. v. Shewalter, 128 Tenn., 363.

FROM HAMILTON.

Appeal from the Circuit Court of Hamilton County. HON. OSCAR B. YARNELL, Judge.

JOHN H. EARLY and SHEPHERD, CARDEN & BASS for plaintiff.

THOS. S. MYERS, for defendant.

MR. T. H. MALONE, Special Judge, delivered the opinion of the Court.

Mrs. Sarah E. Goodner sued her former husband, George W. Goodner, for breach of promise of marriage, and was given a verdict of $1,000 by the jury.

Defendant's motion for a new trial having been overruled, he took an appeal in the nature of a writ of error to the court of civil appeals, which affirmed the judgment in an opinion delivered by Mr. Justice FAW; and the case comes here on petition for the writ of *certiorari*.

The case is a most unusual one on its facts.

The parties (who will be styled as they were below) were married in 1893, and lived together, except for brief intervals, until 1917.

Prior to marriage with the defendant, the plaintiff became the mother of an illegitimate child, of which the defendant was not the father. It seems to be undisputed that the defendant was aware of this when he married her.

Some five years after their marriage the plaintiff became the mother of another child, which bore her husband's name, and was acknowledged by him as his child.

Plaintiff's evidence tends to show that she was cruelly treated by the defendant during their married life; that he was tyrannical and abusive; that she lived almost the

life of a slave, not only doing all household work, but the heaviest field work, such as plowing and harvesting, and actually handling one end of a crosscut saw; that by her efforts she contributed largely to the value of the defendant's estate.

From time to time the defendant's conduct would cause the plaintiff to leave home for short periods, but she always returned. Finally, in 1917, she left and refused to return.

In May, 1918, a written agreement was made between them whereby the plaintiff accepted property worth about $2,000 as a settlement from her husband, and relinquished all claim to any other property which he might have.

In July, 1919, she filed a divorce bill against her husband, charging him with cruel and inhuman treatment. She testifies that this bill was filed at his request, and that he paid her lawyer's fee. He admits paying the fee.

An order *pro confesso* was taken against the husband, and upon the hearing, a decree *a vinculo* was granted to the wife. This was in October, 1919.

Plaintiff further testifies that in November, 1919, the defendant came to her and importuned her to return to him, promising to take her to Georgia and marry her "over again;" that she finally consented and returned to his home, and remained there about five months; that she on various occasions asked the defendant to carry out his promise and marry her; that he made excuses and put her off, but finally told her that he was not going to marry her; that she thereupon left and never returned.

At the time of the promise to marry the plaintiff was forty-nine years old, and the defendant sixty-six.

The present suit, for breach of this promise, was brought by plaintiff on September 13, 1920.

The defendant pleaded *non assumpsit,* and filed a second plea, in which he avers:

"That at the time of the alleged agreement to marry the plaintiff he was, and still is, naturally impotent and incapable of procreation, and was and still is incapable of consummating a valid marriage, and this fact was well known to the plaintiff at the time."

This plea was, on motion of plaintiff, stricken from the file for insufficiency, and an additional plea to the same effect was also stricken.

This action of the trial judge is assigned as error.

I. It is claimed by the plaintiff that the defendant cannot raise this question, because the pleas, after being stricken from the record, were not made part of the bill of exceptions.

We find, however, from an inspection of the record, that these pleas were incorporated *in haec verba* in defendant's motion for a new trial, which motion, in turn, was copied in full in the minute entry. This was sufficient to preserve the pleas.

II.  Did the pleas present a sufficient defense?

This question will be considered in connection with certain instructions given by the trial judge to the jury, and his refusal to charge certain requests seasonably offered by the defendant.

1.  We think this case is to be distinguished at the outset from those in which some incurable congenital malformation of one spouse, existing at the time of the marriage, has been made the ground of a divorce or of an annulment,

at the suit of the other spouse. See, for example, *Deane* v. *Averling,* 1 Robertson, 279; *Payne* v. *Payne* (1891), 46 Minn., 467, 49 N. W., 230, 24 Am. St. Rep., 240; *W.* v. *H.* (1861), 2 Swabey & Tristram, 240.

S'uch a right is, indeed, secured to the other spouse in this State by subsection 1 of section 2448 of the Code of 1858 (Shannon's Compilation, section 4201), which specifies as one of the causes of divorce from the bonds of matrimony:

"That either party, at the time of the contract, was and still is naturally impotent and incapable of procreation. (1799, ch. 19, sec. 1; 1835-36, ch. 26, sec. 1.)"

2. Granting that the incapacity of the defendant would have entitled the plaintiff to a divorce, if she had seen fit to seek it, on the grounds set forth in his plea, does this confer upon the plaintiff the right to set up his own condition as a defense to an action for breach of promise?

(a) On this question there has been a great division of opinion from an early day. The view which a particular judge entertains of the essential nature of such a contract is likely to incline his mind in the one direction or in the other.

This is nowhere better illustrated than in the leading case of *Hall* v. *Wright* (1858), Ellis, Blackburn & Ellis, 746, reversed in the Exchequer Chamber (1859), Ellis, Blackburn & Ellis, 765.

This was an action by Isabella Hall against George Wright for breach of promise of marriage, the defendant's third plea being as follows:

"That after the agreement and before any breach thereof, defendant became and was, and thenceforth hitherto has been, and still is, affected with dangerous bodily dis-

ease, which has occasioned frequent and severe bleeding from his lungs, and by reason of which disease defendant then became and was, and from thenceforth hitherto has been, and still is, incapable of marriage without great danger of his life, and therefore unfit for the marriage state, whereof the plaintiff had notice before the commencement of this action."

The jury found for the plaintiff, and assessed her damages at £100, ERLE, J., directed verdict to be entered for the defendant on the third plea, with leave to move to enter verdict for the plaintiff with £100 damages.

On the argument of this motion the judges differed in opinion, and delivered their judgments *seriatim*. CROMPTON, J., thought the plea bad. ERLE, J., thought the defendant entitled to succeed in his defense. WIGHTMAN, J., thought judgment should go for the defendant. Lord CAMPBELL, C. J., thought the plea bad, and the plaintiff entitled to damages.

The court being evenly divided, the junior judge (CROMPTON) formally withdrew his opinion, and the conclusion was thus reached that judgment should be entered for the defendant, under his third plea.

On appeal this case was heard in the Exchequer Chamber before a body of jurists even more illustrious, and the same diversity of opinion was manifested. We quote excerpts from each opinion.

WATSON, B., was of opinion that the case should be affirmed, saying:

"It was conceded on the argument and in the court below that insanity of mind would be an excuse, and that the insane person would not be responsible in damages. If

so, why not insanity of body? In each case, as alleged, he is to answer in damages for not marrying; in each case the marriage is void (*Parmeter* v. *Paremeter*); in each case it is no act of the defendant, but the act of God."

BRAMWELL, B. (one of the great English judges), in a full opinion, expressed the view that the judgment should be affirmed. In the course of the opinion it is said:

"Surely, if a man said to a woman, 'I have promised to marry you, and must and will, but will never live with you or treat you as a wife,' he would not be offering, but refusing, to perform his contract. *Ludes* v. *Cook*, 4 Esp., 256. The contract is a contract to marry and perform the duties of marriage. I think it better to recognize what we all know exists, and to assume it exists for a good purpose, than to affect to ignore it. Besides, there is abundant warranty for so doing. The marriage of an impotent man is null; and two of the three reasons for matrimony given in the marriage service involve the capacity for sexual intercourse."

Again it is said: "The contract to marry has been assimilated to those to which it bears no resemblance. A man contracts to load a ship and cannot. Well, that is his misfortune; a loss will be sustained by him or the shipowner; and it is convenient that, if he puts no condition in his contract, none should be implied, and that, if his contract is unconditional, he should bear the loss consequent on his nonperformance. So of a contract to sell corn. But in the case of a contract to marry, with supervening impotency, there is a loss which must fall on both, whether the contract is fulfilled or not. It seems to me, then, that sexual intercourse is contemplated by parties who agree to

marry as an essential part of their engagement; that inability for it in one party is an excuse for performance by the other; that, where such excuse exists without any default in the disabled party, it is contrary to principle to hold that an option is given to the other; consequently that the right of secession in such case is mutual."

WILLES, J., expressed the view that the judgment should be reversed, saying:

"The contract in this case is stated by the plaintiff in the declaration, and admitted by the defendant in his plea, to have been in terms an unconditional one; and it is guesswork, not construction, to read it as conditional. Its performance is not impossible; and it is not enough to show, in answer to an action upon a contract, that its performance is inconvenient or may be dangerous. The delicacy of health alleged as an excuse is the man's misfortune, not to be visited, beyond what is inevitable, upon the woman. If either party is to have the option of breaking off the match, it ought to be the woman. The court have no right to say what is best for her. If the man were rich or distinguished, and the woman mercenary or ambitious, she might still desire to marry him for advancement in life. I do not sympathize with such a woman, if any there be; but this is not a question of sentiment. If it were, I might put the case of a real attachment, where such an illness as that stated in the plea supervening might make the woman even more anxious to marry, in order to be the companion and the nurse, if she could not be the mistress, of her sweetheart."

CROWDER, J., was of opinion that the case should be reversed, and judgment should go for the plaintiff, saying:

"But I am of opinion that it is no excuse for the breach of a promise to marry that the performance of the conjugal duties would be attended with danger to the defendant's life. Such a state of illness may make it matter of the greatest prudence on his part to break his contract, and to pay such damages as a jury may award against him for the breach. But, in my opinion, it is no legal answer to the action. I desire to refer to the arguments and reasoning of Lord CAMPBELL in the court below as conclusive in my mind upon this view of the case. It would be idle for me to repeat them."

MARTIN, B., was also of opinion that the case should be reversed, saying: "It must be taken that the law deems a contract to marry to be one of pecuniary value; and, assuming that it could not reasonably be expected, under the circumstances stated in the plea, that the defendant should marry the plaintiff, I can see no reason why he should not compensate her for the breach of the contract. Why should the consequences of the misfortune fall upon her, and not upon the defendant? See Lord ELLEN-BOROUGH's judgment in *Barker* v. *Hodgson,* 3 M. & S., 267, and the dicta of Lord HOLT in *Thornborow* v. *Whitacre,* 2 Ld. Raym., 1164. For these reasons I think the judgment ought to be reversed."

WILLIAMS, J., thought the plaintiff entitled to judgment, saying: "But it is alleged that a contract to marry stands on a peculiar footing, and is subject to implied conditions peculiar to itself. And the authorities certainly afford ground for contending that, if the parties in this case had been reversed, and the present defendant were suing the present plaintiff on the contract, she might have set up his

bodily inaptitude as a ground for refusing to perform her contract, just as he might have pleaded her corporal inaptitude, or want of chastity, which had supervened or had been discovered since the making of the contract. But there is no authority, that I am aware of, or any good reason, for allowing the one party to set up his or her corporal infirmity or unfitness for marriage, or his or her impurity, in answer to the requisition of the other, who may nevertheless wish for and insist upon the performance. A woman would not be allowed to plead her own want of chastity if she were sued for a breach of promise of marriage, notwithstanding the man might well set it up as an answer if she were to seek to enforce the contract."

He was, therefore, for a reversal of the case.

POLLOCK, C. B., thought the *judgm*ent should be affirmed. In the course of his opinion it is said: "There are conditions to be implied\ (I think) on both sides in such an agreement. I think every one would admit that it is a condition on the part of the female that she should continue chaste, and perhaps, more generally (though this is not so clear), that her conduct should not be such as to make a marriage with her improper. I think the test that may be safely applied to ascertain whether any such condition is implied or not is to consider what would be the case if a man were, after such a promise to marry, to lose by accident or disease the capacity to contract matrimony by becoming inpotent. To such a case the decisions about impossibility do not, I think, apply. By the act of God the contract has become void. The man may go through the ceremony of marriage; but he cannot marry; the ceremony would not be binding; it would operate nothing; and

the contract to marry is broken by the calamity of his becoming impotent.

"It has been suggested that in such a case the woman may be contented with the society of the man, and that the choice ought to rest with her, and that, if she be willing to marry, he must marry or pay damages. I am of opinion that such is not the law. I think, if the man can say with truth, 'By the visitation of Providence I am not capable of marriage,' he cannot be called upon to marry; and I think this is an implied condition in all agreements to marry. I think that a view of the law which puts a contract of marriage on the same footing as a bargain for a horse or a bale of goods is not in accordance with the general feelings of mankind, and is supported by no authority."

(b) Although, as will be perceived, the foregoing case is not on all fours with the instant case, and although its authority has in some instances been doubted, the contrast in the views of the judges makes it most interesting, and for this reason it has been reviewed at some length.

In this country the conflict of opinion is equally marked. See, for example, *Sanders* v. *Coleman* (1899), 97 Va., 690, 34 S. E., 621, 47 L. R. A., 581, holding that illness which would endanger the life of the prospective husband in the martial relation is a sufficient defense, and *Smith* v. *Compton*, 67 N. J. Law, 548, 52 Atl., 386 (1902), 58 L. R. A., 481, holding exactly the opposite.

(c) We may distinguish those cases holding that, where the prospective husband, by the reappearance of a complaint which he believed to be cured, has become afflicted with a loathsome disease, which would be communicated

to his wife and to their future offspring, this may be a defense to an action for breach of promise. As illustrating this line of cases, see *Shackleford* v. *Hamilton* (1892), 93 Ky., 80, 19 S. W., 5, 15 L. R. A., 531, 40 Am. St. Rep., 166, where the court says:

"No greater crime in law or morals could have been committed by the appellant than a performance of his agreement."

See, also, *Allen* v. *Baker* (1882), 86 N. C., 91, 41 Am. Rep., 444.

(d) To be distinguished also is such a case as *Gring* v. *Lerch* (1886), 112 Pa., 244, 3 Atl., 841, 56 Am. Rep., 314, where the failure or refusal of the woman to submit to a surgical operation for the purpose of curing her natural defect was held to be a defense to her action.

3. None of the foregoing authorities, as will be perceived, control the present case, however persuasive may be the reasoning advanced.

For here there is no claim that marriage will injure the defendant or endanger his life; nor is it claimed that such marriage would be physically injurious to the plaintiff; nor is there a question of surgery.

The defendant here is seeking to set up as a defense the claim that at the time of the agreement "he was, and still is, naturally impotent and incapable of procreation, and was, and still is, incapable of consumating a valid marriage, and that "this fact was well known to the plaintiff at the time."

Defendant's counsel relies on the case of *Mary L. Gulick* v. *Peter H. Gulick* (1879), 41 N. J. Law, 13; and that case on its facts more nearly resembles the case at bar.

147 Tenn.—34

At the time of the contract the plaintiff was thirty-nine and the defendant seventy-nine years of age. It further appeared from the proof at the time "that the defendant was sexually impotent, owing to a surgical operation, and that such infirmity was known to the plaintiff."

Under the New Jersey statute (Revision 1877, p. 315, section 4): "Divorces from the bond of matrimony may be decreed in case the parties, or either of them, were, at the time of such marriage, physically and incurably impotent; . . . and all marriages in such case shall be invalid from the beginning and absolutely void."

In view of the plain terms of this statute, the court said: "The defendant could not bind himself to enter into a marriage which, by force of its own inherent conditions, might be declared by the Chancellor to be void *ab initio*. Having made such a promise, he had a *locus penitentiae*, and could repudiate it without subjecting himself to a liability to be sued. The plaintiff should have been nonsuited at the trial, and on this account the rule must be made absolute."

It is hardly necessary to point out the marked difference between the New Jersey statute and our own statute hereinbefore quoted. Our statute does not say that such a marriage is void *ab initio*. Since the case of *Gulick* v. *Gulick* was decided solely on the terms of the statute, it is not in point in the present investigation.

4. Although he had stricken out the pleas, the trial judge permitted evidence to be introduced as to the defendant's sexual condition; and on this point he told the jury:

"If the defendant entered into this contract of marriage, he cannot rely on the fact that he could not perform a sex-

Goodner v. Goodner.

ual act.   That is something of which he cannot complain. You may consider that on the question of the amount to be awarded the plaintiff in .the event you find there was a contract and that it was breached by the defendant.   That is one of the things you may consider in fixing the amount that she would be entitled to recover, if she knew his condition; you take that into consideration in estimating the amount of the recovery."

The court refused to give the jury the following instructions offered by the defendant:

"I charge you, gentlemen of the jury, that without sexual intercourse, the ends of marriage, the pleasures and enjoyments of matrimony cannot be attained.   The first purpose of marriage is the bringing up of offspring.   The second ought to be the avoiding of fornication. The law recognizes these two as the principal ends of marriage, namely, a lawful indulgence of the passions to avoid licentiousness and the procreation of children according to the evident purpose of Divine Providence.   If you find that it is impossible for the defendant to perform the sexual act, because of a natural defect, then a union of these persons by a marriage ceremony would be against the public policy of this State, and there would be more honor in the breach than in the observance of such a contract.   This is especially true where the female knows of the defect.

"If you find that the defendant is so afflicted and has been so afflicted for his natural life or for years, and that the plaintiff knew this fact, then she cannot recover even though it appears there was a contract to marry and that it was breached."

5.   We think the foregoing request. if otherwise unobjectionable, was a mere abstract statement of legal principles,

and not applicable to the particular case before the court and jury.

(a)' The request ignores one important fact, viz. the respective ages of the parties—sixy-six in the man, and forty-nine in the woman. The "bringing up of offspring" could not, with any show of reason, be assigned as the primary purpose of such a marriage.

In the case of *Hatch* v. *Hatch* (1908), 58 Misc. Rep., 54, 110 N. Y. Supp., 18, the husband was sixty-nine, and the wife fifty-six years of age, at the time of their marriage. Some three years afterward the wife brought suit to annul the marriage. Denying the relief sought, POUND, J., says:

"The courts decline to grant annulment for physical incapacity where, by reason of the advanced years, of the parties at the time of the marriage, the desire for support and companionship, rather than the usual motives of marriage, must have actuated them. 19 Am. & Eng. Ency of Law (2d Ed.), 1169. In this case plaintiff's disappointment is in no wise caused by her husband's alleged incapacity for marital intercourse. She was a soldier's widow, and, when she gained a husband, she lost a pension. For reasons not disclosed to the court, the exchange proved an unsatisfactory one to her, and she now seeks to annul the marriage in order to recover her pension. She has no just cause of complaint against her husband, and the court declines to hold the marriage invalid."

The text of the American & English Encyclopedia of Law (volume 19, p. 1169), reads as follows: "Where the parties were of such an age at the time of marriage that they could not have been actuated by the usual motives of

marriage, but must have sought only support and companionship, the courts decline to grant a decree for impotency."

In *Shafto* v. *Shafto* (1877), 28 N. J. Eq., 34, the husband was in his sixtieth year and the wife sixty-three at the time of the marriage. They lived together for nearly six years, and then quarreled over domestic differences and separated.

The hr band brought suit for divorce, alleging that, by reason of certain physical defects on the part of the wife, the marriage had never been consummated, and made a motion that the wife be subjected to a physical examination.

Denying this motion, the Chancellor quotes from the opinion of Sir WILLIAM SCOTT in *Briggs* v. *Morgan*, 3 Phill., 225, where it is said: "The age is entitled to great consideration. The injury is very different from that which may occur at an earlier period of life, at a time of life when the passions are subdued and the marriage is contracted only for comfortable society."

In the case of *W.* v. *R.* (1876), 1 Probate Division, 405, a wife then forty-seven years of age, brought suit against her husband twenty-three years after marriage, to have the marriage annulled on account of the incurable malformation and consequent impotence of the husband at the time of their marriage. Physicians appointed by the court reported that the husband's incapacity was incurable, and the wife *virgo intacta*.

Sir Robert PHILLIMORE, in considering whether she was entitled to this relief, said: "Now the law which governs these cases is peculiar. The marriage is not void, but voidable by a judicial sentence. The contract of marriage

differs generally, and in some respects materially from other contracts. It cannot be dissolved at the pleasure of the parties, nor can it be annulled at any period of the married life even when one of the parties by a physical incapacity has been unable to perform some of the duties incident to it. For instance, could it be maintained that either husband or wife could at the age of eighty set aside their marriage on the ground that one of the two parties had, sixty years ago, been visited with an affliction of malconformation? The law would surely hold that the complaint was, according to Lord STOWELL's expression, 'insincere;' that the party complaining had made his or her election to abide by the contract, and would apply the canonist's maxim, '*Habeat tanquam soror vel tanquam frater.*' The law would be very inhuman if it allowed the husband, after a long cohabitation, without any satisfactory explanation of the delay, to throw his wife in her middle or old age, with ignominy, shame, and poverty, upon the world because she had been originally, however innocently, by physical causes incapacitated from performing some of the duties of the married state. The law therefore has always required sincerity in the complainer, that is, a real sense of the grievance complained of unmixed with any other subsidiary motive, and, as a necessary proof of such sincerity, has also required all reasonable promptitude to be exhibited by the complainer in seeking legal redress."

After reviewing certain authorities, it was said, in conclusion: "In the case before me the wife has been married more than twenty-seven years, and is in her forty-eighth year, an age when neither the procreation of children nor the gratification of the passions—two of the various ends

of marriage which usually lead to the institution of these suits—can reasonably be expected. The delay is much longer than any I believe which has hitherto occurred in these causes, and it is not satisfactorily accounted for. The wife does not, in my opinion, bring the suit for the single object of redress on account of the impotency of her husband, but for another reason also.

"Upon all these grounds, I refuse to grant the prayer of the wife, and dismiss the husband from the suit."

In the case of *Brown* v. *Brown*, 1 Hagg., 524, it was said by Sir J. NICHOLL, by way of *dictum*, that a man of sixty who marries a woman of fifty-two should be contented to take her *tanquam soror*—a remark which would probably be doubted in the present state of medical science.

While these cases refer to divorce proceedings, the reasoning on which they rest makes it apparent that the trial judge properly refused to give the abstract and rigid instruction offered by the defendant.

Suppose the respective ages of the parties had been fifty-nine and seventy-six; would it still be contended that such a marriage would be against public policy because one or both of the contracting parties were incapable of consummation?

(b) Another fact ignored by the defendant's request is the previous marriage of the parties and their cohabitation as husband and wife for more than twenty years.

This was not a case of impotency or other physical disability arising after the engagement or agreement to marry, on which suit was brought, as in the English case of *Hall* v. *Wright*, supra, or in the American case of *Shackleford* v. *Hamilton*, 93 Ky., 80, 19 S. W., 5, 15 L. R. A., 531, 40 Am. St. Rep., 166.

The parties were perfectly well acquainted with the husband's capacity or lack of capacity when they entered into their second agreement to marry.

It should be stated here that the plaintiff in her testimony denies absolutely the defendant's claim of physical incapacity at the time of their previous marriage. She insists that he was the father of the boy born after their marriage; and it is certain that the husband never sought to repudiate his paternity until shortly before the institution of the present suit.

But, conceding the correctness of the defendant's insistence as to his congenital and incurable defects, if the woman who had lived with him as a wife for some twenty-three years was willing to make another attempt, and had promised again to marry him, it was not for him to make objection and seek to repudiate his promise on account of his alleged physical incapacity.

As was said by Sir J. P. WILDE in the case of *A* v. *B.* (1868), Law Reports, 1 Probate & Divorce, 559, (where third persons sought to claim that a marriage was void on the ground of impotence after the death of one of the parties) :

"Now, it is obvious enough that this matter of impotence is one which ought to be raised only by the party who suffers an injury from it, and who elects to make it a ground for asking that the contract of marriage should be annulled. For, although it has been said that the procreation of children is one main object of marriage, yet it cannot be doubted that marriages between persons so advanced in years as effectually and certainly to defeat that object are perfectly legal and binding. The truth is, *con-*

*sensus non concubitus facit matrimonium.* In all cases in which the incapacity to marriage is one in which society has an interest and which rests on grounds of public policy, it would be wrong and illogical that validity or invalidity should depend upon the option of the parties, and in all such cases the marriage is absolutely 'void,' and not 'voidable' only. But impotency has always hitherto been considered in the ecclesiastical courts (and since their abolition in the Divorce and Matrimonial Court) as a matter of personal complaint only."

And as pointedly remarked by WILLES, J., in *Hall* v. *Wright,* supra: "If either party is to have the option of breaking off the match, it ought to be the woman. The court have no right to say what is best for her."

This observation is especially appropriate to the instant case. The plaintiff knew better than any one else the physical and moral defects of the defendant. If she was willing to go on with that companionship, such as it was, it is not for the courts to substitute their judgment and to say that her contract is void, and that, on grounds of so-called public policy, the defendant might breach it at will.

We are therefore of opinion that there was no error in striking the pleas; that the court correctly charged the jury on the point under consideration; and that the instruction requested by the defendant was properly denied.

III. It is insisted that the verdict of the jury in this case is so excessive as to indicate passion, prejudice and caprice upon the part of the jury.

It is a sufficient answer to this assignment to point out that the trial judge and the court of civil appeals have

concurred in holding otherwise. *Railroad Co.* v. *Moriarity,* 135 Tenn., 446, 461, 186 S. W., 1053; *Grant* v. *L. & N. Ry. Co.,* 129 Tenn., 398, 410, 165 S. W., 963; *Carolina etc., R. R. Co.* v. *Shewalter,* 128 Tenn., 363, 365, 161 S. W., 1136, L. R. A., 1916C, 964, Ann. Cas., 1915C, 605.

As already pointed out, the question of the plaintiff's physical condition was allowed by the trial judge to go to the jury in mitigation of damages. While the testimony of two physicians tended to support the defendant's contention, the testimony of the plaintiff, and other circumstances in the record, not necessary to mention, tended to support a contrary view. The jury's attention was directed, in apt words, to the defendant's worth or lack of worth as a husband, and to the value or worthlessness of his society and companionship; and they were plainly instructed that, if they believed the plaintiff would have gained nothing valuable by the marriage, they should allow nominal damages only.

While we do not concur in all of the reasoning adopted by the court of civil appeals in its able opinion, we believe that, undoubtedly, the correct result was reached.

The petition for *certiorari* is therefore denied.