LOUISVILLE & NASHVILLE RAILROAD CO. *v.* GARRETT.

1. RAILROADS. *Carrier. Passenger. Failure to pay fare. Offer of payment by another before eviction.* A passenger who gets upon the cars of a railroad company in good faith, in ignorance of the fact that a tax certificate would not pay his fare, having no intention to impose upon the carrier, cannot be treated as a mere trespasser, but on failure or refusal to pay his fare, after request and after reasonable opportunity allowed to comply, he may be ejected or put off the cars by the conductor, but if before eviction another person offer to pay the fare, the carrier is bound to receive the fare and convey the passenger.

Railroad Company *v.* Garrett.

2. SAME. *Same. Punitive damages.* Punitive damages may be given where the act done, was in the strict line of the duty of the conductor, but done under a state of facts not justifying the act, or done in a wrongful or careless manner to the injury of plaintiff.

3. PLEADINGS AND PRACTICE. *New trial. Remittitur. Conditional* Upon a motion for a new trial, the trial judge stated he thought the damages too high and would require a *remittitur*, if the defendant would abide the judgment and not appeal, to which defendant refused to agree, therefore he allowed the judgment to stand. Such practice is reprehensible.

FROM DAVIDSON.

Appeal in error from the Law Court of Davidson county.    J. C. GUILD, J.

ED. BAXTER and SMITH & ALLISON for Railroad Co.

BATE & WILLIAMS for Garrett.

FREEMAN, J., delivered the opinion of the court.

This action is brought to recover damages for being "wrongfully, wantonly and maliciously ejected from defendant's cars, whereby the party was greatly injured," etc., as appears by the first count of the declaration. We need not consider any question arising on the second count, averring the tender of a tax receipt in payment of the fare, as the circuit judge ruled in favor of the defendant on that count, holding the tender not good, and the verdict of the jury is evidently based on the first count alone.

A preliminary question is presented as to exceptions taken to reading the deposition of Sandy Barnes, which was offered by the plaintiffs as testimony in the case. The first exception is, because in the caption of the

deposition it appears that it was taken in a case pend-
ing in "the Law Court of Davidson county, Tennessee,"
when in fact the title of the court is the "Law Court
of Nashville." We need only say, that this objection
is one that "sticks in the bark." The Law Court of
Nashville is a law court, and the only one in the
county of Davidson. There is nothing in this, nor
is there anything in the other objection, that it does
not appear from the caption or deposition itself, whether
the plaintiff or defendant or counsel were present. In
other words, nothing is said on this subject. We do
not think this in any way affects the deposition. Be-
ing taken on interrogatories filed, the inference is that
they were filed to obviate the necessity of counsel
being present; nor do we see that it would have ef-
fected the competency of the deposition, if these parties
had been merely present—it being otherwise regular.
The caption and certificates substantially conform to
the requirements of the statute, and that is what is
required by sec. 3848 of the Code.

The real questions in the case, however, arise on
the charge of his Honor, the circuit judge, on two
propositions. First, as to the offer to pay the fare
by a third party when demanded by the conductor, for
which the plaintiff was put off the train; and, second,
on the subject of vindictive or punitive damages.

A brief summary of the facts will be sufficient to
present these questions. About the 10th of August,
1871, plaintiff got on the train in Edgefield, near the
city of Nashville, to go to Gallatin, in an adjoining
county. He had no money, but had a certificate of

payment of a tax to the Davidson county tax collector, of a tax levied for the benefit of the defendant railroad company. This tax certificate was for some cents more than the fare. The testimony is uncontradicted, and no suspicion thrown over its truthfulness, that the plaintiff in good faith believed this certificate would be received in payment of his fare. He had travelled over the Edgefield & Kentucky road, and paid his fare with like certificates. He swears positively that he did not get on the cars with the purpose of making a case to test the question of the liability of the road to take such certificates, and his statements are corroborated by the fact that he was poor, had probably but this one certificate on the road, and was not likely to have been a man to have engaged in such litigation.

There was no ticket office where he got on the train, that he might have tested whether his certificate would be received before going on the train, but it was the customary point for passengers from Edgefield to get on trains.

After going over two miles, the conductor came into the car where he was, collecting fare of passengers and taking up tickets. When he reached plaintiff, he tendered him the tax certificate, which the conductor refused, saying to him he must pay $1.10, the fare, or he would put him off the train. He told him he had no money, and that he was sick, and urged him to take him to the next station, a few miles on, where he could get the money from friends and pay him. The conductor then took hold of him,

either by the coat collar or arm, and walking rapidly with him along the car to the door—after ringing the bell to stop the train—as he opened the door a passenger, as he says, "from motives of humanity," said to the conductor ''let him go back, I will pay his fare." The weight of the proof is, that the conductor replied it is too late, and passed on to the platform, leading or having plaintiff in front of him. As plaintiff got on the steps the train jerked and he fell off on some loose rocks, slightly hurting his hand and giving him something of a shock, though doing him no serious injury.

The plaintiff was upwards of sixty years old and very feeble, while the conductor was a large, stout, robust man. We may assume the fact to be that the conductor heard the proposition of Williams to pay the fare, not only from the fact that witnesses say it was spoken loud enough to be heard over the car, and was so heard by several farther from the speaker than he was. It was addressed to him, and therefore more likely to be heard by him. But what makes this a conclusive assumption is, that he was present in court, summoned as a witness, and was not examined by defendant to contradict any statement of the facts as given by the plaintiff or his witnesses.

From this proof we gather, that the jury were warranted in finding that the plaintiff was rudely seized, though not roughly enough to injure him, and expelled from the cars by such force as we have indicated, when he had not in the slightest degree refused to get off, nor made any resistance to the act of the con-

ductor, and in fact was totally unable to have done so. The weather was exceedingly warm, and he must in his enfeebled condition have felt it keenly in walking back, as he was compelled to do, to his home.

On these facts we assume the party was properly on the cars, so far as his motives and good faith were concerned. Having been under a wrong impression as to the use of the certificate in paying his fare, he was bound to pay his fare, or at any rate unless this payment was made to the conductor, he might properly have been put off the train, and no liability would be incurred by so doing, provided it was done in a proper manner, and with no unnecessary rudeness, insult or injury. In other words, if the plaintiff got on the cars in good faith, in ignorance of the fact that his tax certificate would not pay his fare, with no intention to impose upon the carrier, he cannot be treated merely as a trespasser in thus getting on the car: Hutchison on Carriers, 459. But on failure or refusal, after request, with reasonable opportunity allowed to comply, to pay his fare, he might be ejected or put off the cars by the conductor.

The fact of a party getting on a passenger car for the purpose of travel, of itself creates by operation of law a contract, or the law defines the terms of the contract, the obligations of which bind both parties. On the part of the carrier, among other things, the party is entitled to be carried with the care required by law, at the established rates and with no unnecessary delay. On the part of the passenger, he is bound as the first duty to pay, or offer, or be willing to

pay his fare according to such reasonable regulations as may be established by the company. Payment, when demanded, is his duty. The receipt of the compensation is the right of the carrier, and this is a condition precedent, without the performance of which he is not bound to perform the service.

Railroads, being public carriers, are bound to carry all who apply, against whom there is no legal objection: Hutchison on Carriers, sec. 538. This duty is imposed by law, upon payment or offer to pay the fare required, or properly due for the service. And it is said—and we think correctly—that if a party in good faith get on a car, in disregard or ignorance of a regulation requiring a ticket before getting on, if ready and willing to pay the price of his carriage when demanded, could not be ejected from the cars because of non-compliance with such regulation, but may demand to be carried to his destination upon an offer to pay according to the carrier's rates: Hutchison on Carriers, sec. 570. The principle is, the carrier is bound to carry, but is entitled to his pay—when this is offered, the law imposes the duty.

This being conceded, it seems to follow that his Honor was correct when he told the jury substantially, that if another person offered to pay the fare before ejection from the car, the carrier was bound to receive it and transport the passenger. It is unimportant to the carrier from whom the money comes. If it is the proper amount, he gets what he is entitled to, and must perform the duty imposed. To require that the passenger shall pay his own money would be absurd.

If another party offers to pay for him, it is precisely the same as if the party finding himself without money to pay, had borrowed the amount from one near him and tendered it. The conductor would have the same right to refuse to accept money thus borrowed, as to refuse the offer made in this case. There can be no difference in principle in the cases.

To test this further, however, suppose a carrier should make a regulation that none but money from the pocket of the passenger himself should be received by conductors on passenger trains, and if money should be offered by a friend to pay a party's fare, it should be rejected, no one could hesitate to say such a regulation would be void as unreasonable, and beyond the power of the company to make. If such a rule could not be properly made, the act of a conductor in such a case, without a regulation to that effect, cannot be justified. For these reasons, we think his Honor did not err on this question in his instructions to the jury, and they were well warranted in finding the party wrongfully ejected, if they found such an offer was made, and was heard by the conductor as he passed to the door for the purpose of ejecting the plaintiff. Public policy, the interest and rights of the public, as well as the known conditions surrounding the business of carrying passengers by railroads in this country, demand that no narrow or technical rules should be prescribed to enable them to exercise any arbitrary authority whatever in the performance of their duties growing out of their relation to the public. On the other hand, every principle of fairness and of right

demands that the carrier should be sustained in enforcing such reasonable regulations as may by experience be found necessary and proper in the conduct and management of the vast machinery to be administered in carrying on this complicated and responsible business.

It is urged, however, and cases are cited tending to support the position, that immediately on failure to comply with the demand of the conductor, the contract was broken, or was forfeited, and the right of the carrier was complete to eject the passenger—regardless of a subsequent offer before actual ejection, to pay, either by himself or another for him.

To this proposition we cannot assent, at any rate in a case like the present. Here was no captious objection or refusal to pay, or comply with a reasonable regulation of the carrier, such as the cases of refusal to give up ticket on receiving a check, or to exhibit ticket or the like as in the cases referred to. On the contrary, it was only an inability to meet the demand for the fare arising out of innocent mistake or ignorance.

The rule contended for stands on too narrow a technical logic to meet the demands of right in such cases. A rule embodying a reasonable and liberal spirit, the one dictated by fairness, and the nature of the duties respectively imposed on the parties, should be laid down. The rule we have given we think embraces the true spirit of the whole contract and the rights of the parties on the subject. The passenger is entitled to transportation, the carrier to fare. When

this is paid or offered, the law imposes the duty— and if offered by or for a passenger before his eviction from the car, then his right is fixed, and the duty of the carrier arises.

Ejection from the car is not in the nature of a forfeiture or penalty to be enforced by the conductor. It is simply the exercise of a legal right, that right to be exercised with due regard to the rights of others. The case of a party taking passage on cars, like the one before us, may well be likened to that of a party who is in another man's house, not having been guilty of a trespass in entering. In such a case the long-settled rule is, that he must be told to leave before he can be forcibly put out, and such a degree of force then only shall be used as is necessary to accomplish the object: Wait's Act. and Def., vol. 6, p. 121, citing *Weaver* v. *Rush*, 8 Term. R , 78; 4 Denio, 448; and if wanton injury be inflicted even on a trespasser, he may maintain an action therefor: *Deane* v. *Clayton*, 7 Taunt., 489. And these rules apply to a railroad company; and a party may lawfully resist being put off the train with unnecessary rudeness or violence: Wait, 122.

An extreme case, it may be, will put this in a light that will perhaps make it clearer. An old feeble woman gets on the car, thinking she has the means of paying her fare, but finds herself mistaken. The law authorizes, and the regulations of the company require, that she shall be put off. But a gentleman sees her case, and after she has been started out of the car proposes to pay, out of motives of humanity.

Could any one say that a carrier, with the obligations of his position, should not promptly receive his compensation and return her to her seat? The common sense of all would at once answer in the affirmative, and the moral sense of every man be shocked at the assertion of a contrary rule.

We do not decide on a case where there is a refusal to pay captiously and vexatiously—we have no such case before vs. But as applicable to the facts of this case, we have no question his Honor's charge was correct, and approve the principle announced.

The next question is, that his Honor allowed the jury, if they thought proper, to give punitive damages or smart money in this case. We held, upon full consideration, in the case of *Haley* v. *Mobile & Ohio Railroad Co.,* 7 Baxt., 243, that a railroad company was liable for vindictive damages, in all cases where the elements required to give such damages were found, as in the case of natural persons. In that opinion by C. J. Deaderick, we approved the principle of the case of *Goddard* v. *Grand Trunk Railroad Co.,* Maine R., cited from American R., vol. 2, 39, in this language: "That there is no class of cases where the doctrine of exemplary damages can be more beneficially applied than in the case of railroad corporations, in their capacity of common carriers of passengers." We see no reason to go over the cases in other States to find support for this view. It is sound in our judgment, and needs no further discussion.

It is proper to say, that the case of *Starnes* v. *Nashville & Chattanooga Railroad,* 9 Heis., 53, did not

intend to announce any contrary general doctrine, and does not, when considered in connection with its facts. So far from limiting the liability of a railroad company, for the acts of its servants, when an injury is done in the performance of the duties of their positions, it was extended in that case to the act of the servant, in. wantonly and for mischievous purposes, using the engine of the company to alarm horses in a wagon—(a proposition the writer of this opinion thinks a very doubtful one.) In a case like that, however, it was said the company should not be held liable for vindictive damages, because, says the judge: "The act complained of. was manifestly done without the defendant's knowledge or consent, and was the willful and unauthorized act of the servant alone." Whether this be correct or not in reference to the facts of that case we need not now determine, but it has no application whatever to the case before us, where the act done was in the strict line of the duty of the conductor—but done under a state of facts not justifying the act done, and in a wrongful and perhaps careless manner, to the injury of plaintiff.

We need not discuss the question of general liability of corporations for the acts of their agents for wrongs done in the performance of their functions. As said by this court in the case of *Nashville & Chattanooga Railroad Co.* v. *Elliott,* 1 Cold., 614: "In general, the only mode in which a corporation aggregate can act is through the intervention of their agents," etc. This, however, is all familiar law, that at this day needs no support from authority,

29—VOL. 8.

As to the amount of damages in this case, we need only say, it is a matter largely left by the law to the discretion of the jury—and we see nothing in the sum allowed in this case, $2,000, which would authorize or require a reversal on this account.

We see nothing in the affidavits of newly discovered testimony worthy of notice. They are but little if any more than the statement of a party that he did not see—some things testified to by plaintiff's witnesses. But in addition we see from the record, that the conductor himself was present in court, as a witness for the defendant, who knew all the facts, and is shown to have been a truthful man, and yet defendant failed to introduce him to contradict the facts deposed to. There was ample means at hand to have had the best testimony that could be had on these questions, which defendant neglected or refused to introduce.

Upon the question of a new trial, his Honor stated he thought the damages too much, and required a *remittitur*, but because the defendant refused to abide by his judgment, and would not agree not to appeal to this court, he allowed the judgment to stand. This was reprehensible; but we see from the record, this was based not on the evidence, but on the affidavits presented on the motion. We do not think these were sufficient, and have so ruled; and therefore as his view was not on the testimony before the jury, we see no error in it.

Let the judgment be affirmed.