674

LAMBERT BROTHERS, INC.

*v.*

GALE LARKINS.

(*Knoxville*, September Term, 1955.)

Opinion filed July 20, 1956.

Rehearing Denied December 7, 1956.

J. EDWARD HYDER, Rogersville, JENNINGS, O'NEIL & JARVIS, Knoxville, for petitioner.

PHILLIPS & HALE, Rogersville, for respondent.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

The jury awarded Larkins damages in the amount of $20,000. The Trial Judge suggested a remittitur of

$5,000. It was accepted under protest and appealed. The Court of Appeals affirmed the Trial Judge. By petition for *certiorari*, heretofore granted, it is prayed that this Court adjudge a further reduction.

In the case of *Koehn v. Hooper,* 193 Tenn. 417, 419, 246 S.W.2d 68, 69, the following rule deduced from previous decisions is stated thus:

"We find no reported case from this Court, since the Court of Appeals was created, in which, when the Trial Judge and the Court of Appeals have concurred in granting or refusing a remittitur, that this Court has interfered with their judgment. The reported cases all present cases where the lower Courts have differed, and where it became necessary for this Court to decide the issue between the two lower Courts. The amount of the verdict being a question of fact which is normally determined by the jury, the concurrence of the two lower Courts forecloses the issue, and if the concurrent finding is supported by material evidence, it will not be disturbed."

The rule stated was not, of course, intended to include verdicts tinctured with corruption of one or more jurors; thereby, an illegal verdict. In such a situation the proper course would be, not to reduce the verdict, but to set it aside. *Reeves v. Catignani,* 157 Tenn. 173, 7 S.W.2d 38.

There is no corruption involved in the present case. Therefore, this Court, assuming it has the authority otherwise, must, in the opinion of its majority, overrule *Koehn v. Hooper, supra,* which is this Court's latest expression upon the question, if it should further reduce the amount of this judgment.

In the opinion of the majority members of this Court, *Koehn v. Hooper, supra,* aside from a code section to be

hereinafter noted, is supported by the previous decisions of this Court.

Several of the cases state that when the Trial Judge and the Court of Appeals have concurred in approving the amount to be allowed, the amount being equal to or less that the amount allowed by the verdict of the jury, the practice has been to treat such concurrence as "well nigh conclusive". *Reeves v. Catignani, supra, Lunn v. Ealy,* 176 Tenn. 374, 141 S.W.2d 893, and *Wolfe v. Vaughn,* 177 Tenn. 678, 688, 152 S.W.2d 631.

Others of our decisions go futher. For instance, in *Carolina, C.&O.R. v. Shewalter,* 128 Tenn. 363, 161 S.W. 1136, 1137, L.R.A. 1916C, 964, the Court said that "we will not interfere in a matter of this sort, where the Court of Civil Appeals has upheld the trial judge". And in *Illinois Cent. R. Co. v. Moriarity,* 135 Tenn. 446, 461, 186 S.W. 1053, 1056, the Court said that it saw no reason "for departing from our usual practice of accepting the concurrent finding of both lower courts on the matter of damages as conclusive". And in *Goodner v. Goodner,* 147 Tenn. 517, 537-538, 249 S.W. 805, 811, 33 A.L.R. 1222, this appears:

"It is insisted that the verdict of the jury in this case is so excessive as to indicate passion, prejudice and caprice upon the part of the jury.

"It is a sufficient answer to this assignment to point out that the trial judge and the Court of Civil Appeals have concurred in holding otherwise."

And in *Provident Life & Accident Insurance Co. v. Rimmer,* 157 Tenn. 597, 600, 12 S.W.2d 365, 367, the rule was stated thus:

"The Court of Appeals, upon reviewing the evidence, sustained the action of the trial judge in direct-

ing a remittitur of the penalty, and, under the facts presented, the concurrent action of the trial judge and Court of Appeals, involving an exercise of discretion, will not be reviewed in this court.''

■ Thus it is that previous decisions of this Court support the rule stated in *Koehn v. Hooper* to the effect that, in the absence of a corrupt verdict, the concurrence of the two lower Courts as to the amount of damages, if supported by material evidence, will not be disturbed here. If corrupt, the verdict should be set aside, not reduced.

Section 27-119, T.C.A., as this Court construes it, is in accord with the rule re-enunciated in *Koehn v. Hooper, supra.* Eliminating provisions immaterial here, that code section provides as follows:

''If the judgment of the trial court, with regard to a remittitur, is affirmed in the Court of Appeals, * * * the party in whose favor the verdict or judgment has been rendered may * * * take the case * * * *upon that point,* to the Supreme Court; and *if* in the opinion of the Supreme Court *the verdict should not have been reduced,* and the Court of Appeals was in error in affirming the action of the trial court, as to said remittitur * * * *the case shall be reversed to that extent, and judgment* shall be *rendered in the Supreme Court for the full amount originally awarded by the jury.''* (Emphasis supplied.)

■ This language can mean but one thing, to-wit,— that the Supreme Court is given jurisdiction to restore the verdict of the jury if, in its opinion, the Trial Judge and the Court of Appeals were in error in reducing it, but is without jurisdiction to reduce that verdict further

than reduced by the Trial Judge or the Court of Appeals. The jurisdiction of this Court, in the language of this code section, is that if this Court thinks the verdict should *not* have been reduced, then the case shall be *reversed to that extent* and judgment rendered *"for the full amount originally awarded by the jury."*

The insistence of petitioner that this Court reduce the verdict below the amount fixed by the remittitur suggested by the Trial Judge and affirmed by the Court of Appeals is rejected, and the judgment of the Court of Appeals, affirming the judgment as finally entered in the Circuit Court, is affirmed with costs of the appeal adjudged against the petitioner. Mr. Justice Swepston dissents.

Swepston, Justice (dissenting).

I respectfully dissent from the majority opinion in this case for the reasons to be stated hereinafter.

The first error to be pointed out is the reference in said opinion to Code, sec. 27-119, T.C.A., relating to remittiturs. That section and the preceding section relate only to a plaintiff and is entirely irrelevant to the right of a defendant to appeal. As the law stood before the enactment of sections 1 and 2 of Chapter 29, Acts of 1911, if the Trial Judge thought that the verdict was excessive he could only suggest that the plaintiff make a remittitur; if the plaintiff made the remittitur, then judgment was entered for the lesser amount and, so far as the plaintiff was concerned, that ended the lawsuit with no right of appeal by the plaintiff; the Trial Judge, however, could not require the plaintiff to make a remittitur and if the plaintiff refused to do so, then the only thing the Trial Judge could do was to grant a new trial.

See the cases cited in *Railroad Co. v. Roberts,* 113 Tenn. 488, on page 494, 82 S.W. 314, on page 315, 67 L.R.A. 495, decided in 1904.

The purpose, therefore, of Chapter 29, Acts of 1911, sections 1 and 2, was to change this rule so that whenever the verdict in the Trial Court's opinion, was so excessive as to indicate passion, prejudice, corruption, partiality or unaccountable caprice on the part of the jury, and the Trial Judge for that reason suggested a remittitur, the plaintiff by said statutes was allowed to accept the suggestion of the remittitur under protest and then appeal to the Court of Civil Appeals at that time, which Court could either affirm the action of the Trial Court, or reverse it to the extent of the remittitur and restore the judgment to the full amount originally ordered in the Trial Court. Then section 2 of said Act provided that the plaintiff might take the case on up to the Supreme Court to have it review the action of the Court of Appeals under the conditions stated in said section.

The only change made in the Act up to the present time is that the part of the sentence containing the words, "so excessive as to indicate passion, prejudice, corruption, * * *," which has been changed to read, "that if in the opinion of the Court of Appeals [or of the Supreme Court, as the case may be], the *verdict of the jury should not have been reduced.*"

Those Code sections, however, have no reference to the rights of the defendant. Again referring to *Railroad Co. v. Roberts, supra,* 113 Tenn. at page 494, 82 S.W. at page 315, the opinion cites *Louisville & N.R. Co. v. Garret,* 76 Tenn. 438; *Nashville, C.&St.L.R. Co. v. Foster,* 78 Tenn. 351, and *Tennessee Coal & R. Co. v. Roddy,* 85 Tenn. 400, 5 S.W. 286, for the law before the Act of 1911,

which was that even though the remittitur was suggested by the Trial Judge to the plaintiff, the *defendant* could not be required to abandon or waive his right of appeal as a condition to acceptance by the plaintiff. It is perfectly obvious that this is still the law and is not affected in the least by the Act of 1911, *supra.*

The majority opinion cites *Koehn v. Hooper,* 193 Tenn. 417, 246 S.W.2d 68, for a rule, now for the first time announced, that where the Trial Court and the Court of Appeals have concurred as to the amount of damages, the Supreme Court will not interfere, except in a case of corruption of one or more jurors.

If there is anything in said opinion about corruption of a juror, I have failed to discover it.

What that case does hold is that, if there is material evidence to support such a concurrent finding, this Court will not disturb or interfere with same. To that I agree, but I shall attempt to demonstrate hereinafter that there is no material evidence to support the concurrent finding of an award of $15,000 in this case.

Before doing so, however, I call attention to the ostensibly unqualified statement of the rule in the above opinion. In support of same are cited *Wolfe v. Vaughn,* 177 Tenn. 678, 152 S.W.2d 631, and *Reeves v. Catignani,* 157 Tenn. 173, 7 S.W.2d 38, but neither of these cases support such an apparently unequivocal statement. To the contrary, they both reiterate the rule as originally stated in *Grant v. Louisville & N. R. Co.,* 129 Tenn. 398, 410, 165 S.W. 963, which is that such concurrence is "well-nigh" conclusive on the Supreme Court. Again, the majority opinion cites a number of cases where the Supreme Court simply stated that it would not interfere

with such a concurrent finding. On the other hand—there are probably equally as many cases where the statement is qualified by such expressions as appear in *Grant v. Louisville & N. R. Co., supra,* and in *Tennessee Coach Co. v. Reece,* 178 Tenn. 126, 156 S.W.2d 404, where the rule is stated to be that such concurrence is conclusive, in the absence of "exceptional circumstances." Thus, there is just as much authority for a qualified statement of the rule, qualified to the extent stated by such expressions, as there is to support the unqualified statement in *Koehn v. Hooper, supra.* Moreover, the co-incidental facts that no case can be found where this Court has interfered with such concurrent finding does not necessarily mean that the Court will not interfere where unusual circumstances exist, but simply means that none of those cases heretofore appearing before the Court have contained what would be deemed by the Court to be exceptional circumstances. Last, in the absence of a statute depriving this Court of jurisdiction to the Act where the circumstances are exceptional, it seems unwise to lay down such an unqualified rule.

In the instant case we do have quite exceptional circumstances in that there was no evidence of permanent injuries to support even a judgment for $15,000 which was the amount entered up after a remittitur of $5,000 on the original verdict of $20,000; when the matter reached the Court of Appeals that Court was much concerned about the amount of the verdict; in reciting its reasons, however, for affirming same it considered the testimony of Dr. Carlson to the effect that such an injury as plaintiff had suffered to his ankle could cause a shortening of the leg; that Court failed to state, however, that the same Doctor testified that the shortness of plaintiff's

leg was not caused by this injury; it was improper for that Court to consider any testimony relating to whether the shortness of the leg was caused by the injury because any such evidence had been expressly ruled out by the Trial Court because there was no pleading to support such evidence; with this evidence ruled out there was no evidence of permanent injury otherwise and the concurrence of the Court of Appeals was based on a misapprehension of the testimony of said Doctor.

These unusual circumstances will more clearly appear by the following detailed statement of the case. The plaintiff was employed as a truck driver for a construction company at Kingsport, Tennessee. About 2:00 o'clock in the afternoon of the day of the accident he drove his employer's truck to the stone quarry of the defendant, which was located along the highway and backed the truck up to a pile of broken stone where he awaited the arrival of the "high-lift" which is a heavy piece of machinery used for loading stone on to customer's trucks. This machine runs on metal tracks and has an arm with a scoop or shovel which shovel weighs about 4 tons. This high-lift was approaching the truck when plaintiff opened the truck cab door on that side and stepped out on the running-board of the truck. The operator of the high-life allowed the shovel to strike the door of the truck which closed on plaintiff and injured his chest and upper part of his body and his right ankle.

When plaintiff extricated himself from the door he got down off the truck on to the ground, walked around to the other side of it and got up in the cab and waited a few minutes until some of the employees of the defendant came and got him and took him to the company doctor, Doctor Lyons. This doctor did not testify.

The most serious insistence made by the petitioner herein is that, although plaintiff predicted his suit principally on permanent injuries, the proof fails to show any permanent injuries. We here call attention to the fact that plaintiff relied upon his own testimony and that of Doctor Goforth who did not treat him but only examined him for the purpose of testifying in the case. The defendant relied upon the testimony of Doctor Carlson, an ortheopedic surgeon who examined plaintiff at the instance of defendant and the testimony of Doctor Burem, who was plaintiff's doctor.

Plaintiff testified that after he was taken home from Doctor Lyon's he was suffering pain. His testimony R. 28 in part is as follows:

"Q. Where were you suffering pain? A. My chest and back and legs.

"Q. Now was one leg hurting more than the other? A. Yes, sir, my right leg, my ankle.

"Q. Where were your chest and back hurting, Mr. Larkins A. All the way from there down to here where it mashed and my back the same way.

"Q. Now you indicate from about your chest-bone down about to the navel your chest was hurting, is that right A. Yes, sir.

"Q. Now was that just straight down or was it all over? A. It was all over—all over this side.

"Q. Now where was your back hurting, Mr. Larkins? A. From right along about my shoulder blade back down to my belt.

"Q. Prior to October 13, 1954, had you ever had any trouble whatsoever with either your chest or your back or your legs? A. No, sir.

"Q. Mr. Larkins, the next day after October 1, 1954, the date of this accident, the next day as I say, what condition was your body in? A. Well I was just sore. I had to lay around on the bed and couch all day.

Q. What was the condition of your breathing? A. I couldn't hardly get my breath and it *hurts* me yet.

"Q. What about your foot, what condition was it in? A. Well it was mashed so bad that I couldn't hardly bear *any* weight on it.

"Q. Was your foot swollen or not? A. Yes, sir.

"Q. Now about your left foot—what condition was it in? A. Well it just skinned a place or two upon my left foot upon my leg.

"Q. The one that was swollen then, was that your right foot? A. Yes, sir.

"Q. Mr. Larkins, since October 13, 1954, some five, almost five months ago, what has been the condition of your right ankle? A. Well its just sore and stays swelled and red streaked and I can't walk on it without it hurting.

"Q. Prior to October of last year did you walk with a limp? A. No, sir.

"Q. Do you now walk with a limp? A. Yes, sir.

"Q. Which leg do you favor, Mr. Larkins? A. My right leg.

"Q. Why do you favor that right leg? A. Well it hurts me all the time.

"Q. You have stated that prior to October 13, of last last year that you had never had any trouble with your ankle before, is that correct? A. No, sir.

"Q. Mr. Larkins, if you stay on your feet any length of time, what happens to that right—A. Well, it swells up and hurts and I can't hardly walk on it.

"Q. What about your sleeping habits? Prior to October 19, 1954, had you ever had any trouble with your sleeping? A. No, sir, not up 'till this.

"Q. Since the date of the accident and up to and including the present day—what are your sleeping habits, Mr. Larkins? A. Well I haven't slept much.

"Q. Well, why haven't you slept much? A. Well there is just so much misery and pain in my chest and back and legs.

"Q. Is there any particular thing with reference to your foot that gives you any trouble at night time? A. Well when I lay down if the cover comes down on my toes it seems like it binds, it just aches and pains and I can't stand it. I have to turn it over to one side or lay my other foot over there to hold it up.

"Q. Kind of making a prop out of your left foot and hold the cover up off of your right, is that right? A. Yes, sir.

"Q. Since the date of this accident have you been able to do any of your ordinary chores around the household there, Mr. Larkins? A. No, sir, I can't do a thing. I tried the other day to bust a little wood.

"Q. Were you able to do it? A. I couldn't.

"Q. Why? A. Well it just hurts my back so bad that I couldn't get over, I couldn't *but* it and I just quit and walked in the house. My wife said 'did you bust any wood?' I said 'No.' I said—"

Witness then testified: R. 31

"Q. Since the accident what has been the condition of your backbone, Mr. Larkins? A. Well it just aches and hurts all the time. I can't hardly stoop over without holding to something or another. I have to hold when I go to set down or get up.

"Q. If you are sitting down, how do you have to get down in the chair, Mr. Larkins? A. Well I hold.

"Q. In arising from the chair can you get up voluntarily or do you have to push yourself up? A. I take my hand and hold and help push up."

Plaintiff's counsel then attempted to show that since the accident one leg was shorter than the other but the Court sustained the defendant's objection because the same had not been plead, in the declaration.

The plaintiff went to his own physician, Dr. Burem who treated him from October 29, 1954 to January 24, 1955 when he dismissed him. His testimony will be referred to hereinafter.

On February 2, 1955 the plaintiff went to Dr. Walter L. Goforth who did not treat the plaintiff but only examined him.

He could therefore testify only to objective findings. He did not make any X-ray pictures but examined him by feeling or palpation. He testified in part R. 57 as follows:

"A. I found evidence of an old injury and rib fractures to the chest mainly on the left side I believe and I found a limitation of motion in the right ankle. A few minor things, evidence of old abrasions, scratches healed.

"Q. All right, what was the condition of the right foot at the time of the examination with respect to

whether it was swollen or whether it was not? A. Well, it was a minor swelling of the foot and a voluntary limitation of motion of approximately 50% and you could manually carry the foot through almost its whole range approximately 30% limitation of motion but it caused considerable pain when you do it manually.

"Q. In layman's language, Dr. Goforth, does that mean that the right foot was limited in its motion by around half. A. Voluntarily.

"Q. Voluntarily, but you could force through so that there would be about a third limitation of motion, is that correct? A. Yes, Sir, approximately.

'Q. Now in the forcing that you did to give it that additional few percent of motion, did that or not give the patient pain? A. It caused him pain.

"Q. And was that considerable or a small amount of pain? A. Well it seems to be—he complained anyway —it didn't seem to be excruciating pain but it hurt him."

He then testified that the plaintiff was limping the day that he examined him. He further testified that he found an irregularity under his shoulder blade that he attributed to an old rib fracture. Also that he conducted an examination by feeling along the middle of his backbone but there was quite a bit of muscle there and he could not feel anything definite. He was then asked and answered:

"Q. State whether or not in your professional opinion the ankle injury is or is not a permanent disability to Mr. Larkins, a man of 52 years of age? A. With treatment I think his ankle could be improved rather remarkably.

"Q. Dr. Goforth, by that do I take it that it could never fully heal? A. I can't answer that."

Dr. Henry S. Buren, above referred to, testified for the defendant. He testified in part R. 113 as follows:

"Q. Doctor, what if anything did your examination disclose? A. Well, at the time I examined him I found on X-ray a fracture of the tenth rib on the left side of his osterior, his back; and at the time I saw him, too, he was complaining of pain in his ankles, chiefly in his right ankle. At the time I saw him he said his left ankle wasn't bothering him too much, but his right ankle was giving him trouble at the time I saw him.

"Q. He said a high-lift or a truck was what caused the accident? A. Yes sir.

"Q. Doctor, back to your description of the fracture to the tenth rib, was there any displacement in the fracture that you could tell? A. No there wasn't any displacement that you could tell.

"Q. Doctor, did that fracture heal uneventfully? A. As far as he was concerned it did, and as far as I am concerned it healed all right. I put a rib belt on him and let him wear it the usual time as we do in most fractured ribs.

"Q. Doctor, what is the usual period of disability, say for a man driving a truck, from a fractured rib in the position that you found this man's rib fractured? A. We usually give them a top six weeks.

"Q. At the expiration of six weeks would you expect the fracture to be healed? A. Yes sir.

"Q. Did this patient following that six weeks period appear to be healed? A. No, after six weeks we took

his rib belt off of him and he was still complaining of pain at that time—

"Q. Doctor let me *interrupt* you there, did the fracture of his rib heal in position? A. Yes as far as I could tell it was.

"Q. Was there any malformation present in his chest that you could detect as a result of this accident on October 13, 1954? A. No I didn't see any malformations.

"Q. Now you also X-rayed his ankles you say? A. Yes.

"Q. Was there any broken bones in his ankles or any fractures in his ankles? A. No not as far as the X-rays are concerned.

"Q. But you say he did continue to complain? A. Yes.

"Q. Doctor when did you last see this patient? A. I saw him last on the 24th of January, 1955.

"Q. And what was his condition at that time? A. Well from a physical examination it was very good but the patient was still complaining of symptoms that he couldn't explain. In other words, he had complaints that was difficult to explain from a physical basis." The Doctor further R. 115 testified:

"Q. Doctor on January 24, 1955 at the time of your last examination state whether or not in your opinion this man is able to work? A. As far as his injury is concerned yes he was able to return to work. I discharged him at that time as far as I was concerned.

"Q. Doctor at the time you saw him on January 24, 1955 what was your opinion as to whether or not he had any permanent disability insofar as these injuries

are concerned? A. I personally do not think that he had any permanent disability at that time.''

On cross-examination the Doctor then testified that the X-ray does not show the bruised or torn ligaments, tissues, tendons and muscles and that this man could have had such injuries and same could continue to be painful for a great length of time. He did not detect any loss of motion in the spine or back but the patient did complain continuously of shortness of breath. The patient complained of his right foot hurting him but the doctor could not see any scars on the ankle. On redirect examination the doctor testified that when he discharged the patient on January 24, 1955, there was no objective evidence that the patient still suffered from any bruises or injuries to his muscles or tendons but that subjectively, that is according to the patient's statement, there was such evidence. He further said that this man was not severely injured, that he walked into the doctor's office and walked out and that when he discharged him that ''as far as I was concerned there was no trouble of a permanent nature.'' He testified that this man was limping at the time he discharged him.

Doctor C. Sanford Carlson at the instance of the defendant examined the plaintiff on February 15, 1955. He testified R. 91 in part as follows:

''Q. What did your examination disclose? A. We observed that the patient was a well developed white male of 52 years who appeared to be in good health. He walked with a limp favoring his right ankle. Generally his posture was good. He was holding his right shoulder higher than his left.

"We found that his chest excursions were good and full. There was a very slight prominence of the left chest just anterior to the sternum.

"Q. When you say his chest excursion is good and full, what does that mean in lay language? A. It means that he had complete movement of the chest wall when he would take in a breath and let out a breath, into the lungs. He had no restriction of movement of the chest.

"Q. Did you find anything else, Doctor? A. We found that the general appearance of his back was good. There was a marked pelvic tilt to the right side. We found that the patient did lack extreme of motion, but he had carried out a good range of motion in all segments. He had no swelling about the right ankle. There were no scars noted about the ankle. We felt that the motions of the ankle were voluntarily restricted, but with suggestions the motions, active motions were about 5% less than the active motion of the left ankle.

"Q. Would that be about 1/20 less Doctor, would that be 5%, 1/20 less? A. Yes sir."

He further testified that he saw no evidence of injury to the shoulder joint but there did appear to be some tenderness on the spinous processes of all the dorsal and lumbar vertebrae. The patient complained also of tenderness over the paravertebral muscles adjacent to the spine but gave no evidence of muscle spasm present; also that the right leg was one and one-half centimeters shorter than the left leg, that is, slightly more than one-half inch. He also mentioned some arthritic changes in the spine that had occurred over a period of several years.

After all of the above, however, the Doctor testified, R. 97 as follows:

"Q. Doctor, in your professional opinion does this man have any disability resulting from the accident, that is any permanent disability resulting from the accident of October 13, 1954, as described to you by the patient? A. I feel that the patient does not present residual disability.

"Q. You mean you could find no disability? A. No sir."

He testified that a shortness of one leg could be due to a congenital defect or to an injury, but on cross-examination R. 98 he was asked and answered:

"Q. The shortness of his right leg which you have described does not represent a disability in your opinion, is that correct Doctor? A. It represents a disability but not as a result of his accident of October 13, 1954."

He further testified R. 100 on cross-examination:

"Q. So that this patient, Mr. Larkins, the plaintiff in this case could very easily develop traumatic arthritis in both his back, his ribs and his ankle, could he not? A. On a basis of his history it is possible that he could. At the time I examined the patient he presented no objective evidence of traumatic arthritis."

The doctor then testified that a limp in itself is not a disability; that it depends upon the underlying cause of the limp. The doctor further testified that such a crushing as claimed by the plaintiff could easily result in shortness of breath and in pain in trying to breathe but that if there had been a severe crushing of the chest such as would cause shortness of breath, the X-ray and the

examination of the external contour of the chest would show evidence of same but that he did not observe any objective evidences of such in this patient.

We have gone into such detail in order to show that in the opinion of the two doctors, Burem and Carlson, the plaintiff has suffered no permanent injury. The testimony of Doctor Goforth to the effect that he could not say whether the ankle would ever fully heal is not any evidence of permanent disability. See *Nashville, C & St. L. Ry. v. Reeves,* 25 Tenn. App. 359, 157 S.W.2d 851.

That leaves only the testimony of the plaintiff given five months after the accident that he was still suffering pain in his back, chest and right foot. Now, while we have no doubt the injuries of plaintiff were painful, yet one must conclude that they were not excruciatingly so, because the evidence shows without dispute that immediately after the accident he walked around to the other side of the truck and climbed up into the cab, where the automobile arrived to take him to the doctor, he walked to the car under his own power; when he arrived at the Doctor's office he went in and out of same unaided by anybody. Also there is an absence of showing of any appreciable lacerations or of blood.

The Court of Appeals, as above stated, was much concerned about the amount of this verdict. In its recital of reasons for affirming same it improperly considered the testimony of Dr. Carlson to the effect that a severe injury to the ankle could cause a shortening of the leg. This was improper because the Trial Court had ruled such evidence not admissible for the reason there was no pleading to support the same; and as above shown, the Doctor said, however, that the shortness in this case was *not caused by this injury.*

It, therefore, seems that in view of such highly speculative evidence as to the question of any permanent injuries or to what extent the injuries will ultimately affect the plaintiff, coupled with the misapprehension of the Court of Appeals of Dr. Carlson's testimony and the error in considering the same at all, that there should be a further remittitur of at least $5,000.