SOUTHEASTERN AVIATION, INC., D/B/A SOUTHEAST
AIRLINES, Petitioner,

*v.*

A. H. HURD, individually and as Administrator of PHYLLIS
ELOISE HURD HALSTEAD, deceased, Respondent.

355 S. W. 2d 436.

(*Knoxville*, September Term, 1961).

Opinion filed March 7, 1962.

Lacy West, Joseph O. Fuller, Kingsport, Erma G. Greenwood, R. R. Kramer, Kramer, Dye, McNabb & Greenwood, Knoxville, of counsel, for petitioner.

Preston H. Taylor, Wilson, Worley & Gamble, Kingsport, for respondent.

Mr. Justice Felts delivered the opinion of the Court.

This was an action brought by respondent against petitioner for alleged wrongful death of his intestate, Mrs. Phyllis Eloise Hurd Halstead. In the Trial Court there was a verdict and judgment for him, which was affirmed by the Court of Appeals. We granted certiorari and the case has been heard here.

Petitioner was a common carrier of passengers by air, a Tennessee corporation, operating an intra-state airline in Tennessee between Memphis and Tri-City Airport and intermediate points. On January 8, 1959, at about 8:30 P. M., its DC-3 plane, on its regular scheduled flight from Memphis to Tri-City Airport, failed to land at that airport, but flew on beyond some 20 miles, and crashed into the side of Holston Mountain in Tennessee, killing all of its passengers and its crew.

Among the passengers thus killed were Mrs. Phyllis Eloise Hurd Halstead and her husband, Frank Halstead. Neither of them ever had a child. Her surviving next of kin was her father; and he, individually and as her administrator, brought this action for damages for her death, charging it was caused by petitioner's negligence in the operation of its plane, in a number of particulars set out in the declaration.

Petitioner removed the case to the United States District Court, claiming it was a "case arising under the laws of the United States." That court overruled this claim and remanded the case. Petitioner then set up certain defenses by pleas and motions, which were overruled, and the case was submitted to the jury. They returned a verdict for respondent for $150,000.00—$145,000.00 compensatory and $5,000.00 punitive. The Trial Court accordingly entered judgment, which was affirmed by the Court of Appeals.

Petitioner urges here three main matters for dismissal and a number of others for reversal and a new trial. It insists (1) that this case should be dismissed under the doctrine of federal pre-emption; (2) that it should also be dismissed because no right of action survived for the

death sued for, either under the law of Tennessee or the law of the United States; and (3) that a verdict should have been directed for petitioner because the undisputed evidence was that the death was due not to its negligence, but to unavoidable accident.

*First.* Petitioner contends that by the Federal Aviation Act of 1958, 49 U.S.C.A. sec. 1301 et seq., Congress took control of the airspace of the United States, set up a federal agency to license and regulate the operation of aircraft, and pre-empted the field so as to supplant all state law and state court jurisdiction therein; and that this action should be dismissed because the state court has no jurisdiction of it and no state law may be applied to it.

Petitioner relies mainly upon the parts of the Aviation Act of 1958 carried in 49 U.S.C.A. secs. 1508(a) (as to airspace,) 1421 (as to power and duty of the Administrator to fix regulations and minimum standards), and 1471-1473 (as to penalties for violations of certain provisions of the Act). The material part of section 1508(a) is in these words:

"The United States of America is declared to possess and exercise complete and exclusive national sovereignty in the airspace of the United States, including the airspace above all inland waters and the airspace above those portions of the adjacent marginal high seas, bays, and lakes, over which by international law or treaty or convention the United States exercises national jurisdiction. * * *" (49 U.S.C.A. sec. 1508).

The substance of section 1412 is that the Administrator of the Federal Aviation Agency is empowered, and it is

made his duty, to promote safety of flight of civil aircraft in air commerce by prescribing rules, regulations, and minimum standards for the design of aircraft, appliances, inspections, maximum hours of service of airmen and other employees, and such other matters as the Administrator may find necessary to provide adequately for safety in air commerce, having regard ''to the duty resting upon air carriers to perform their services with the highest possible degree of safety.''

█ It appears the purpose of the Federal Aviation Act of 1958 is to take control of the airspace of the United States, to set up federal agencies to license and regulate the operation of aircraft, and to provide rules, regulations and minimum standards to promote the efficiency and safety of such operation, and generally to accomplish the purpose of the Act. *Air Lines Pilots Association, International v. Quesada* (1960), 2 Cir., 276 F.2d 892, 894-895.

It seems clear this Act does not exclude state law not inconsistent with its purpose. Its language above quoted (sec. 1508 (a)) is the same as that of the Civil Aeronautics Act of 1938, 49 U.S.C.A. sec. 176(a), which was held not to exclude consistent state law—a law of Nebraska taxing aircraft used interstate in landing on and departing from airports within that state. *Braniff Airways v. Nebraska State Board, etc.,* 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 970.

There, the Court said that ''these Federal Acts [the Air Commerce Act of 1926 and the Civil Aeronautics Act of 1938] are bottomed on the commerce power of Congress, not on national ownership of the navigable airspace, as distinguished from sovereignty''; and that fed-

eral power over navigable airspace, like federal power over navigable streams, "does not prevent state action consistent with that power." To the same effect: *Huron Portland Cement Co. v. Detroit* (1960), 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852.

The conclusion that the Federal Aviation Act of 1958 does not exclude consistent state law, or alter existing remedies under state law, seems to be strengthened by the words of the savings clause of that Act (49 U.S.C.A. sec. 1506), which are as follows: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

The Court of Appeals put its decision upon this savings clause, citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, to the effect that "there is no federal general common law", and holding that this saving of "the remedies now existing at common law or by statute" refers to the common law and statutes of the several states. Learned counsel for petitioner insists that this reference is not to state law, but to federal law. We think this argument is unsound. *Porter v. Southeastern Aviation, Inc.* (1961), D.C., 191 F.Supp. 42, 43.

The language of this savings clause, above quoted, is the same as that of the Interstate Commerce Act (49 U.S.C.A. sec. 22), which has been held to refer to the remedies under the common law and statutes of the several states and to preserve their "general and concurrent jurisdiction" in suits for damages against an interstate carrier. *Pennsylvania R. Co. v. Puritan Coal Mining Co.*, 237 U.S. 121, 130, 35 S.Ct. 484, 59 L.Ed. 867, 872; *Penn-*

*sylvania R. Co. v. Sonman Shaft Coal Co.*, 242 U.S. 120, 37 S.Ct. 46, 61 L.Ed. 188; *Central New England Ry. Co. v. Boston & Albany R. Corp.*, 279 U.S. 415, 420, 49 S.Ct. 358, 73 L. Ed. 770, 775.

The Federal Aviation Act of 1958 appears to be merely an administrative measure, limited to the regulation of the operation of aircraft in the interest of public safety. It does not touch the traditional area of the law of torts or private right, and does not give any remedy for an injury to such right, such as an injury to the person of a passenger caused by an air carrier's negligence in the operation of its plane.

Petitioner likens this Act to the Labor Management Relations Act, 29 U.S.C.A. sec. 141 et seq. which preempts the field and excludes state law in labor disputes. But since the latter affords no remedy for recovery of damages caused by a tort, state courts have jurisdiction in such a case to award damages according to "its traditional law of torts." *United Construction Workers etc., v. Laburnum Construction Corp.*, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025; *International Union, U.A.A. & A.I.W. v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030; cf., *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 243-244, 79 S.Ct. 773, 3 L.Ed.2d 775, 782, with *Charles Dowd Box Co., Inc. v John F. Courtney et al.*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 283.

■ But for another and stronger reason we think the state court has jurisdiction in this case. Respondent's (plaintiff's) declaration charged common-law negligence in several particulars, negligence in violating certain regulations of the Civil Aeronautics Board, and negligence so extreme as to be gross and wanton. That is, it is a

suit in tort upon a right created by the law of the state, and not a case arising "under the Constitution or laws of the United States."

Nor did it lose its character as an action for negligence under state law because it also averred a violation of regulations of the Civil Aeronautics Board. Such averment merely added another ground of negligence for recovery; it did not raise an issue of federal law or invoke a federal right which would be supported if such law were given one construction or effect and defeated if given another. *Dennis v. Southeastern Aviation, Inc.*, D.C., 176 F.Supp. 542, 543; *Pan American Petroleum Corp. v. Superior Court*, 366 U.S. 656, 81 S.Ct. 1303, 6 L.Ed.2d 584, 589-591, and cases there cited.

It was for this reason that this case was held not removable, not being a case under the Constitution or the laws of the United States, or of diversity of citizenship. The same conclusion was reached by the United States District Courts in two other similar cases growing out of the same accident. *Dennis v. Southeastern Aviation, Inc.*, supra, 176 F.Supp. 542; *Porter v. Southeastern Aviation, Inc.*, supra, 191 F. Supp. 42.

*Second.* Petitioner insists that this action for the wrongful death of Mrs. Halstead cannot be maintained because no right of action survived for her death, since she left no one for whom such right survived under the Tennessee wrongful death statute (T.C.A. secs. 20-607, 20-610, 20-611), the material parts of which are as follows:

"20-607.—The right of action which a person * * *, whose death is caused by the wrongful * * * killing

by another, would have had against the wrongdoer, in case death had not ensued, shall not abate, * * *, but shall pass * * * to his next of kin; or to his personal representative, for the benefit of his widow or next of kin * * * . In the case of the death of a married woman, such right of action shall pass to the surviving husband.''

''20-610.—The damages which may be recovered for the wrongful killing of any married woman shall go to the surviving husband and children of the deceased equally, the husband taking a child's share, and if any child be dead leaving descendants, such descendants shall take the deceased child's part. If there are no children nor descendants of children, then the damages shall go exclusively to the husband. * * *''

''20-611.—A suit for the wrongful killing of the wife may be brought in the name of the husband for the benefit of himself and the children of the wife, or in the name of administrator of the deceased wife, or in the name of the next of kin of the wife. * * *''

It was stipulated that Mrs. Halstead and her husband were passengers on petitioner's plane when it crashed on Holston Mountain in Tennessee; that both of them died of the injuries thus received; and that there was ''no sufficient evidence'' that they ''died otherwise than simultaneously.'' She had no descendant and her surviving next of kin was her father, respondent.

Upon this it is argued that it must be taken as a fact that her husband did not survive her, but both died ''simultaneously''; that since she was a ''married woman'' and left no ''surviving husband'' or ''children,''

or "descendants," no right of action survived for her death under our statute above quoted.

The argument is that there still prevails in this State the common law rule, that a personal action dies with the person, except where its survival is provided for by statute; that our statute provides for such survival only for those named as beneficiaries therein; and that the only persons named in the statute as beneficiaries for whom a right of action for the wrongful death of a "married woman" survives are her "surviving husband," and "children" (or descendants); and since Mrs. Halstead left none of these, no right of action survived for her death.

The Court of Appeals expressed the view of the question of survival of a right of action for Mrs. Halstead's death, upon the facts of this case, was ruled by our Simultaneous Death Act (T.C.A. sec. 31-502), which is in these words:

"Where the title to property or the devolution thereof depends upon priority of death and there is no sufficient evidence that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived, except as provided otherwise in this chapter."

That Court reasoned that the word "property" included not only "money," etc., but also "things in action" (T.C.A. sec. 1-305 (15)); that the right of action for Mrs. Halstead's death preserved by our statute is the right she would have had, had she not died, and that this right passed as property of hers under the Simultaneous Death Act as if she "had survived her husband" and died as a widow.

Petitioner, however, contends that she did not in fact survive her husband and die as a widow, but died at the same time with him as a "married woman"; that while the Simultaneous Death Act affected the disposition of her property, it did not purport to amend the wrongful death statute or affect the question of survival of a right of action for her death under that statute; and that that statute preserved such right only for her "surviving husband" or descendants," but not for her next of kin or father.

■ The manner in which our present wrongful death statute (T.C.A. secs. 20-607, 20-610, 20-611)' has been made up through the years by a patchwork of a number of Acts lends plausibility to petitioner's argument. An examination of such statutes separately, however, we think, shows the fallacy of this contention—shows that the right of action for wrongful death of a married woman survives for her surviving husband and descendants, if any; if none, for her *"next of kin,"* including a parent or collateral.

Our first wrongful death statutes were Chapter 58, Acts of 1849-50, and Chapter 17 of the Acts of 1851-52, which were codified in our first official Code of 1858, the pertinent parts of which are as follows:

"2291. The right of action, which a person * * * whose death is caused by the wrongful act or omission of another, would have had against the wrong-doer, in case death had not ensued, shall not abate * * * but shall pass to his personal representative for the benefit of his widow and next of kin, free from the claims of his creditors."

"2292. The action may be instituted by the personal representative of the deceased; but if he decline it, the widow and children of the deceased may, without the consent of the representative, use his name in bringing and prosecuting the suit, on giving bond and security for costs, or in the form prescribed for paupers. * * *"

"2293. If the deceased had commenced an action before his death, it shall proceed without a revivor. The damages shall go to the widow and next of kin, free from the claims of the creditors of the deceased, to be distributed as personal property."

As has often been said, this statute creates no new right, but merely keeps alive the right the deceased would have had, and passes it to his personal representative for the benefit of his "widow and next of kin," the recovery being no part of his estate, but being distributed as personal property, free from the claims of his creditors. *Memphis St. Ry. Co. v. Cooper,* 203 Tenn. 425, 313 S.W.2d 444; *Brown v. Selby,* 206 Tenn. 71, 74, 332 S.W.2d 166.

This statute (2291-2293) does not mention a *married woman* or a *child,* but uses the words "a *person* whose death," etc., as being the one whose right of action is kept alive. The word "person" is comprehensive and embraces every human being, male and female, married and single; and the words *"his widow* and *next of kin"* may include persons of either sex, under the rule of construction that words "importing the masculine gender may include the feminine and neuter" (1858 Code sec. 50, T.C.A. sec. 1-304).

Accordingly, this statute has been construed as "not being limited to the case of a killing of a husband or father, but as designed to *abrogate the common law rule,* and to include *every case of wrongful killing,* including that of an infant or a *married woman*" (italics ours) (*Trafford v. Adams Express Co.,* 76 Tenn. 96, 100). *Bream v. Brown,* 45 Tenn. 168; *Railway Co. v. Lilly,* 90 Tenn. 563, 18 S.W. 243.

In *Bream v. Brown,* supra, and *Trafford v. Adams Express Co.,* supra, it was held that under the statute (2291-2293) the right of action for the wrongful death of a married woman survived and passed to her administrator; and that her husband was entitled to the recovery *jure mariti,* or as a beneficiary named in the statute. These cases were approved in *Railway Co. v. Lilly,* supra, where the Court said:

"The person whose right of action shall not abate or be extinguished by death may be an infant in its mother's arms, ([*Louisville and Nashville*] *Railroad Co. v. Connor,* 9 Heisk 19,) or a married woman, (*Bream v. Brown,* 5 Cold. 168;) and in the latter case the husband, if living, is entitled to the recovery, upon the ground that the word 'widow,' as used in the statute, includes both the feminine and the masculine gender, and means either widow or widower, as the case may be, (*Trafford v.* [*Adams*] *Express Co.,* 8 Lea 96.)"

Under this statute, as construed by these cases, it is clear that the right of action for the wrongful death of a married woman survives and passes to her personal representative for her surviving husband, if any; if none, then for the benefit of her next of kin, which, of course,

would include a descendant, a parent, or a collateral, as the case might be.

By Chapter 86, Acts of 1897, it was provided that "the damages which may be recovered for the wrongful killing of any married woman shall go to the surviving husband and children of the deceased equally * * *"; if no children or descendants of children, then exclusively to the husband. It was further provided that the suit may be brought in the name of the husband, or in the name of her administrator.

Thus, the Act of 1897 did not, by its terms, apply to a case of wrongful death of a married woman who (dying simultaneously with her husband) left no surviving husband and no children (or descendants), where the right of action passed to her administrator for the benefit of her next of kin. The statute (2291-2293) as applied to that kind of case, was not touched by the 1897 Act, but remained as it stood before that Act.

Our wrongful death statute (2291-2293) was re-enacted into our 1932 Code (secs. 8236-8238), without material modification so far as concerns the question here involved. So, these provisions of the 1932 Code are to be given the same construction as before, upon the rule that where a statute which has received a judicial interpretation is re-enacted, such interpretation "forms a part of the enactment." *Smith v. North Memphis Savings Bank,* 115 Tenn. 12, 30, 89 S.W. 392.

The 1897 Act was brought forward into the 1932 Code (secs. 8239 and 8241), with one significant change: by adding the words "the next of kin of the wife" as one of the classes of persons who could sue for her wrongful death, making section 8239 read as follows:

"A suit for the wrongful killing of the wife may be brought in the name of the husband for the benefit of himself and the children of the wife, or in the name of administrator of the deceased wife, or *in the name of the next of kin of the wife*" (italics ours).

Thus, this statute authorizes a suit for wrongful death of the wife to be brought by her husband, by her administrator, or by her next of kin; that is, where she left no surviving husband or descendant, such a suit may be brought by her next of kin, e. g., a parent, as in this case. This seems a legislative recognition of the prior construction of our statute that such right of action does survive to her next of kin, if she leaves no surviving husband.

The idea that such right of action survives to her next of kin (including a parent), is further borne out by the amendment made by the 1950 Code Supplement (sec. 8236), providing for such survival "where his or *her* natural parents or parent or next of kin are unknown, then to his or her legally adoptive parent or parents * * *" (italics ours).

Chapter 210, Acts of 1953, amended the 1950 Code Supplement by adding at the end of section 8236, this: "In the case of the death of a married woman, such right of action shall pass to the surviving husband." It also amended 1932 Code Supplement (sec. 8239), by adding a provision that the husband may compromise such a suit or release such a right of action.

Thus, this 1953 Act, by its own terms, applied only to the case of the death of a married woman who left a surviving husband; it could not apply where there was

no such husband; nor did it affect the rights of her next of kin where she left no surviving husband or descendant, or modify the pre-existing law in such a case.

■ Recurring to T.C.A. sec. 20-607 et seq., above quoted, it will be seen that 607 is a re-enactment of our prior statutes (1858 Code sec. 2291; 1932 Code, sec. 8236; 1950 Code Supp., sec. 8236; Acts of 1953, Chapter 210, sec. 1), and is, therefore, to be given the same construction which had been given those statutes. *Smith v. North Memphis Savings Bank*, supra.

As we have seen, the provision of 607 from its beginning down to the semi-colon after the words ''his next of kin,'' is broad and comprehensive, and includes every case of the wrongful death of any woman, whether married or single, and whether survived by a husband or descendant, or only by her ''next of kin'' (e. g., a parent), and such right of action survives to her beneficiaries, whether they be husband, or descendants, or next of kin (parent).

This broad general provision is not modified or cut down by anything in any subsequent part of our wrongful death statute. Such subsequent parts (the last sentence of 607 and 610 and 611) are a compilation of the Acts of 1897 and 1953, which, as we have seen, apply only in the case of wrongful death of a married woman who left a surviving husband or children (or descendants), and not to a case where there was no surviving husband or descendant.

■ So, our conclusion is that the right of action for Mrs. Halstead's wrongful death, with no surviving husband or descendant, did not abate but passed to her ''next

of kin"; "or to his [her] personal representative, for the benefit" of her "next of kin" (T.C.A. sec. 20-607); that is, her father, respondent.

 *Third.* Petitioner sought a directed verdict upon the two grounds above discussed and the further ground that there was no evidence to support the verdict—no evidence it was guilty of any negligence causing the death sued for. In considering this question, we must take the strongest legitimate view of the evidence to uphold the verdict—take as true all the evidence tending to support it and discard all countervailing evidence. *Smith v. Sloan,* 189 Tenn. 368, 376-377, 225 S.W.2d 539, 227 S.W.2d 2.

The evidence, so taken, tended to prove, and the jury could reasonably have found (as their general verdict implies they did), the following facts and circumstances making out the negligence charged in the declaration:—

As stated, petitioner, a common carrier of passengers by air, was operating an intra-state airline in Tennessee between Memphis and Tri-City and intermediate points. On January 8, 1959, Mr. and Mrs. Halstead, among others, were passengers on petitioner's DC-3 plane on its regular scheduled flight, Flight 308, from Memphis to Tri-City Airport. Its pilot Captain Bond, assisted by its First Officer Irvin, was in charge of the part of this flight from Memphis to Nashville, and from there on, its pilot Captain Gollmier and First Officer Irvin were in charge.

This plane was equipped with only one Automatic Direction Finder (ADF), which is a radio compass with a needle that can be seen and a sounding device that can be heard, the needle automatically and continuously

indicating the direction from the plane to the ground radio facility to which the ADF is tuned, and the device identifying it by sound. When weather conditions prevent visual contact with the ground, and the plane must fly under Instrument Flight Rules (IFR), and ADF enables the pilot to know his locations and directions as he approaches an outer marker ground radio facility, and to know when he passes over such marker.

On Flight 308, as the plane approached Nashville, its ADF was not properly functioning; and it failed to "pick up" or identify the radio ground facility at the outer marker approach (near Linton some 20 miles west of Nashville), either aurally or visually. Captain Bond landed the plane at the Nashville Airport; and as he left it, he informed Captain Gollmier that the plane's ADF was "malfunctioning." The plane, nevertheless, was permitted to proceed on its flight to Knoxville and thence to Tri-City Airport.

Tri-City Airport was equipped with all the modern, up-to-date electronic devices and navigation and communication aids with which other airports are generally equipped. Often weather conditions are such that the pilot cannot see landmarks and the plane must make an instrument approach and landing. These devices at Tri-City Airport enable a plane, if its instruments are working properly, to make such a landing without difficulty or danger. Such landings have become more or less routine, not attended with undue risk, and are reasonably safe.

It appears that weather conditions at Tri-City Airport at the time in question were not unusual for that time of year. There was a north wind 10 to 15 m. p. h.,

"a ceiling of 900 feet broken, 1700 feet overcast, visibility three [miles], light .snow, fog." While this condition prevented visual contact with the ground and made an instrument landing necessary, it does not appear that this was difficult or dangerous for a plane with its instruments properly working. In fact, within three or four minutes after Flight 308 was due to land there, a Piedmont plant landed there without any trouble.

As Flight 308 approached Tri-City Airport, its pilot, by radio, notified the control of its approach; and the tower operator acknowledged the message, gave the pilot information as to the weather, and advised him he was cleared to make an approach and come in and land on runway 27. The pilot next reported to the operator that he was descending from his elevation of 5,000 feet and was making an "outer marker" approach. This was at 8:24 P.M. The operator acknowledged the message and told the pilot to report when he was over the outer marker coming inbound, which was 3.7 miles from the airport, and he would be cleared to land.

Just at that time the tower operator received the message of the approach of the Piedmont plane. After a lapse of eight minutes from the receipt of the last message from the pilot of Flight 308, when the plane was due to be over the outer marker, the tower operator asked the pilot for his position and altitude. The pilot replied: "I am *having trouble with my ADF*. I *didn't pick up the outer marker, either aural or visual*" (italics ours). That was the last message. The plane flew on eastward some 20 miles beyond the airport, and crashed into the side of Holston Mountain.

As stated, this plane had only one ADF, and it was not working, or so the jury could reasonably have found. Without at least one ADF properly working, the plane was not airworthy, and should not have been permitted to leave the ground in Nashville. The proof was that most up-to-date aircraft now are equipped with two ADF's and that two on each plane are necessary to meet the highest skill of the art.

There were three methods of landing, and petitioner's pilot selected the outer marker approach, when either of the other methods would have been better. Under the regulations governing flying there, a plane making the outer marker approach is prohibited from flying more than five miles eastward beyond the airport. This is because of the presence of Holston Mountain, which is over 3,000 feet high. When this pilot failed to "pick up" the outer marker, he should have made an immediate "about face," and climbed to an altitude of at least 5,000 feet, flown west, and undertaken to make another approach.

A common carrier of passengers for hire is not an insurer of their safety, but owes them a duty of the highest degree of care consistent with the practical operation of the plane. The carrier must exercise such care not only in respect of the operation, but also of the equipment and maintenance of the plane. 6 Am.Jur., Aviation, section 51; *Knoxville Cab Co. v. Miller*, 176 Tenn. 88, 138 S.W.2d 428. We find nothing to the contrary of this common law rule in the Federal Aviation Act of 1958. That Act recognizes that a duty rests upon air carriers "to perform their services with the highest possible degree of safety" (49 U.S.C.A. sec. 1421).

662

 Upon the facts and circumstances of this case, we think the jury could reasonably have found that petitioner (defendant) breached its duty of care to its passengers aboard, and was guilty of negligence in respect of the condition of its plane and the manner of its operation, and such negligence caused the death sued for. So, we think, there was ample evidence to take the case to the jury and to support their verdict.

 We also agree with the lower courts that the evidence herein made a jury case under the maxim *res ipsa loquitur:* where the thing causing the harm is shown to be under the management of defendant (or its servants), and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of due care.

 While there is a conflict of authorities, many well-considered decisions hold that in a case where the maxim *res ipsa loquitur* is applicable, a plaintiff does not lose the benefit of it by alleging specific acts of negligence which he fails to prove. Such is the rule in this State. *Nashville Interurban Ry. Co. v. Gregory,* 137 Tenn. 422, 433, 193 S.W. 1053.

It is true some of the older cases held that *res ipsa loquitur* did not apply to airplane accidents because they were then of common occurrence without negligence (see *Towle v. Phillips,* 180 Tenn. 121, 172 S.W. 2d 806). But, in the last decade or so, the progress of aviation has been such that it has now become an ordinary mode of transportation and is as safe or even safer than other modes so that now plane accidents do not happen in the

ordinary course of things if those who have control use proper care.

Accordingly, courts now generally hold the maxim *res ipsa loquitur* applicable to such accidents. This matter was recently discussed by the Court of Appeals in a well-considered opinion by Judge Howard, in the case of *Capital Airlines, Inc. v. Frances S. Barger, Admx.*, 47 Tenn.App. 636, 643-650, 341 S.W.2d 579. This Court denied certiorari; and we think that case contains a correct statement of the law in this State in airplane accident cases; and that the maxim *res ipsa loquitur*, applied in that case, applies equally in the case before us.

Petitioner, however, contends that the doctrine of *res ipsa loquitur* should not apply to this case because its servants and agents did not have exclusive control of the plane but were under the direction of the Aviation Agency operating the control tower at Tri-City Airport and giving petitioner's pilot instructions as to clearance and landing, etc.

We think there is no merit in this contention. These Aviation Agency employees operating the control tower were merely giving instructions and affording aid to the pilot in making an approach and landing. They were not in control of the plane. Petitioner's employees had exclusive physical control of it. In *Lobel v. American Airlines, Inc.*, 2 Cir., 192 F.2d 217, the Court rejected a contention similar to that now made by petitioner. There, Circuit Judge Jerome N. Frank said:

"We pay little heed to defendant's claim that it did not have exclusive control of the plane because Air-Traffic-Control regulations governed the height at

which it had to travel. It is enough that defendant had complete physical control of the mechanism, even to the point of disregarding regulations for the immediate safety of its passengers."

*Fourth.* Petitioner insists that the verdict is so grossly excessive as to evince passion, prejudice and caprice on the part of the jury; that the Court of Appeals erred in holding the verdict was not excessive; and that we should hold such verdict excessive and either reverse the judgment and grant a new trial or require a substantial remittitur as a condition for refusing such new trial.

It appears that the Trial Judge, after fully considering the question of the amount of the verdict, approved it and entered judgment thereon. The Court of Appeals, likewise, fully considered the question, discussed the elements which, in its opinion, justified the amount allowed, and fully concurred with the Trial Court as to the amount of damages to be allowed. There is no contention that the verdict was illegal or corrupt.

In the absence of a corrupt verdict, the concurrence of the Trial Court and the Court of Appeals as to the amount of damages, if supported by any material evidence, will not be disturbed by this Court. *Lambert Bros., Inc. v. Larkins,* 200 Tenn. 674, 296 S.W.2d 353.

There was material evidence to support the verdict for $145,000.00 compensatory damages. But, we think, there was no evidence to support any allowance of punitive damages, no evidence that petitioner was guilty of such gross and wanton negligence as to justify any award for punitive damages.

The rule in this State is that punitive or exemplary damages is allowable for negligence only where

such negligence is so gross and wanton as to "raise a presumption of conscious indifference to consequences." *Railway Co. v. Lee,* 90 Tenn. 570, 18 S.W. 268; *Consolidated Coach Co., Inc. v. McCord,* 171 Tenn. 253, 258, 102 S.W.2d 53; *Inter-City Trucking Co. v. Daniels,* 181 Tenn. 126, 130, 178 S.W.2d 756.

"Exemplary damages are only allowed where a wrongful act is done with a bad motive, or so recklessly as to imply a disregard of social obligations, or where there is negligence so gross as to amount to positive misconduct. *Railroad Co. v. Guinan,* 11 Lea, [98] 103." *Railway Co. v. Lee,* supra.

We find no evidence of any such negligence in this case. While petitioner's (defendant's) pilot and First Officer were negligent in undertaking to fly a plane not airworthy, and in their manner of operation of the plane, there is nothing to show such gross and wanton negligence on their part as to evince conscious indifference to consequences. It must be remembered that their own lives were at stake, and they evidently expected to make a safe landing.

Since there is no basis in the evidence to support the item of $5,000.00 for punitive damages, that amount will be disallowed. If plaintiff will remit the sum of $5,000.00, the judgment of the Court of Appeals in the sum of $145,000.00 will be affirmed and a judgment will be entered for plaintiff against defendant in the sum of $145,000.00, with interest on that sum from the date of the overruling of the motion for a new trial (*Monday v. Millsaps,* 197 Tenn. 295, 271 S.W.2d 857; *Capital Airlines Inc. v. Barger,* supra, 47 Tenn. App. 636, 341 S.W.2d 579).

Otherwise, the judgment will be reversed and the case will be remanded for a new trial.

Petitioner has raised a number of other matters by its assignments of error. We have carefully considered all of such matters and find no merit in any of them. We think they do not require further discussion. We are satisfied with the disposition of them made by the Court of Appeals. All of petitioner's assignments of error are overruled and the judgment of the Court of Appeals will be affirmed upon the condition above stated. The costs of the appeal in error are adjudged against petitioner and the surety on its appeal bond.