Frances Lola **WOMACK,**
**Plaintiff-Appellee**
**(84–5613),**

and

James A. **Chandler, et al.,**
**Plaintiffs-Appellees**
**(84–5614),**

v.

Donald J. **GETTELFINGER, et al.,**
**Defendants/Third-Party**
**Plaintiffs-Appellants,**

v.

Ronald D. **KENNEDY, et al., Third-Party Defendants-Appellees (84–5651).**

Nos. 84–5613, 84–5614 and 84–5651.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 14, 1986.

Decided Dec. 29, 1986.

Rehearing and Rehearing En Banc
Denied Feb. 19, 1987.

Joseph B. Yancey, Knoxville, Tenn., Thomas Lynn Tarpy, Donald K. Vowell, argued, Knoxville, Tenn., for Gettelfinger.

William D. Vines, III, argued, Knoxville, Tenn., James C. Wright, Butler, Vines, Babb & Threadgill, for Womack.

F. Michael Fitzpatrick, argued, Knoxville, Tenn., for Kennedy.

Charles C. Burks, Knoxville, Tenn., for other appellees.

Robert W. Knolton, Oak Ridge, Tenn., for Woods.

Before JONES and NELSON, Circuit Judges, and PECK, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

At 6:30 in the morning of October 14, 1983, defendant Charles S. Ritter, a relatively inexperienced truck driver operating a tractor-trailer owned by defendant Gettelfinger Farms, entered a two lane state

highway from the driveway of a restaurant in rural Tennessee. The highway ran north-south, and Mr. Ritter approached it from the west side. Keeping the rear wheels of his trailer in sight in his rear view mirror, and taking care that they did not go into a ditch that was present at the side of the driveway, Mr. Ritter made a wide right turn, swinging onto the shoulder at the far side of the road. He intended to pull into the southbound lane at the completion of his turn.

Third-party defendant Ronald D. Kennedy, driving his automobile north on the highway, saw the headlights of the truck pointing toward him from the shoulder. It was still dark, and there was a very heavy fog. Confused by the position of the on-coming truck headlights, and failing to see the trailer angled across the road, Mr. Kennedy drove into the side of the trailer. One of his passengers, William Sidney Womack, was killed, and another passenger, plaintiff James A. Chandler, was injured.

Mr. and Mrs. Chandler and Mr. Womack's widow brought federal court diversity actions against Mr. Ritter and Gettelfinger Farms, seeking compensatory and punitive damages. The defendants filed third-party complaints against Mr. Kennedy and against Joe R. and Linda Woods, the operator and owner, respectively, of an automobile that hit the Kennedy car some minutes after the initial accident.

The two original actions were tried to a jury, and after defense motions for a directed verdict as to punitive damages had been denied, Mrs. Womack and Mr. and Mrs. Chandler recovered judgments against Mr. Ritter and Gettelfinger Farms for compensatory damages totaling $610,-963.02 and punitive damages totaling $1,250,000. The magistrate before whom the case was tried then entered summary judgment against Gettelfinger Farms and the truck driver on their third-party claims for contribution or indemnity and for damage to the tractor-trailer. The magistrate held that these claims were barred by the jury's finding that the defendants had been guilty of conduct warranting the award of punitive damages. While the case was on appeal, Mr. and Mrs. Woods entered into a $2,500 settlement with Mrs. Womack and obtained a release of liability from her. On the strength of this release, the Woods have moved for dismissal of the appeal of the summary judgment as to them on mootness grounds, the third-party complaint in the Chandler case having been dismissed by agreement prior to trial.

The central issue presented on appeal is whether the magistrate erred in submitting the claim for punitive damages to the jury and in overruling a motion for judgment notwithstanding the verdict on the punitive damage issue. The question is a close one, but we have concluded that the Tennessee courts probably would not permit an award of punitive damages under the circumstances of this case. We shall therefore reverse both the judgment for the plaintiffs, insofar as it awards punitive damages, and the summary judgment for the third-party defendants.

I

The rig that Mr. Ritter was driving consisted of a 1979 Mack cab-over tractor, with manual transmission and five forward gears, and a refrigerated trailer 42 feet in length. Gettelfinger Farms, a trucking concern, turned the rig over to Mr. Ritter on September 29, 1983, when he started work for Gettelfinger Farms as a probationary employee. Mr. Ritter had driven the tractor-trailer for several thousand miles by the time of his accident, picking up and discharging loads of perishable food products at various points in Mississippi, Texas, Michigan, Tennessee, Ohio and Kentucky.

On the evening before the accident Mr. Ritter was driving east on Interstate Route 40 in Tennessee, hauling a full load of food products that he was supposed to deliver in New Jersey the following afternoon. He testified that he pulled off the road at about 9 p.m., having encountered thick fog, and spent the night sleeping in his cab. As is customary, the diesel engine of his truck and the diesel-powered refrigerator unit on

his trailer were left running. Mr. Ritter got up a few minutes before 6 a.m., made a safety check, and noted that the fuel gauge on the refrigeration unit's diesel fuel tank registered only one-eighth full. Although it was still foggy, Mr. Ritter resumed his journey, keeping an eye out for a place to refuel. Having noticed a billboard advertisement for a truck stop that he assumed would be at the next exit, as he testified, Mr. Ritter took that exit and drove north for a short distance on Tennessee State Route 95.

Seeing a lighted restaurant at the right hand side of the road, Mr. Ritter parked his truck on the shoulder of the road, still pointing north, and went into the restaurant to ask where he could buy fuel. He was told that he would have to turn around and go back in the direction from which he had come.

Mr. Ritter testified that he then went back to his truck, turned off his "four-way flashers" (both turn signals on the tractor and on the trailer), signaled for a left turn, and pulled onto the road. Because he was going very slowly, looking for a place to turn around, he testified that he put his flashers back on.

About two-tenths of a mile farther on Mr. Ritter saw another restaurant, this one on the left side of the road. The restaurant had a paved driveway and parking area. Mr. Ritter made a left turn into that driveway, looped around in the parking lot, and stopped his truck before reentering the highway. He testified that he looked both ways, saw nothing coming, and pulled out onto the road to begin his turn to the right. He was operating in low gear at half throttle.

Looking down to his right, Mr. Ritter saw a ditch at the side of the driveway. He wanted to make sure that his rear wheels did not slip into the ditch, which might have caused his loaded trailer to flip over on its side, so he made a wide turn, pulling onto the shoulder at the far side of the road. He kept the right rear wheels of his trailer in sight in his mirror, to make sure he was keeping the wheels away from the ditch. The fact that the tractor did not have power steering may have led him to make his turn even wider than it would have been otherwise.

As Mr. Ritter was maneuvering onto the road, Mr. Ronald Kennedy, an iron worker at a local construction project, was driving north in a Ford Escort automobile. Two fellow iron workers, Mr. Womack and Mr. Chandler, were passengers in the car; Mr. Chandler was in the front seat, and Mr. Womack was dozing in the back. Mr. Kennedy's car was equipped with halogen fog lights, and it was going about 35 miles an hour.

Rounding a slight curve to the south of the restaurant, Mr. Kennedy saw the headlights of the truck about 400 or 500 feet away. Surprised at the position of the headlights, Mr. Kennedy made a comment about them to Mr. Chandler. Mr. Chandler responded "It looks like he is on our side [of the road]" and then said "No, he is over to our right." Mr. Kennedy agreed, saying "Yeah, he is sitting on the shoulder of the road." Neither man saw the trailer angled across the road until it was too late to stop. Mr. Kennedy had taken his foot off the accelerator, slowing down to about 25 miles per hour, but did not see the trailer until he was past the headlights of the tractor. Mr. Kennedy swerved to the left just before the impact, but could not avoid hitting the trailer. The driver of the truck, Mr. Ritter, (concentrating, perhaps, on his rear wheels and the ditch) did not see the oncoming automobile in time to flash his lights, sound his horn, or otherwise signal Mr. Kennedy to stop. There was evidence from which the jury could reasonably have inferred that the truck's four-way flashers were not on. The truck was equipped with a reflectorized triangle, but Mr. Ritter had not set it out before starting his turn. There was testimony from a state official, Ronald Stanley, the triangle would have done no good in the fog. Flares would have been visible, but Gettelfinger Farms did not equip its trucks with flares and was not required to do so by government regulations.

Mr. Stanley, the state official, happened on the scene just after the accident. Driving south on State Route 95 at a speed of 30 to 40 miles per hour, and seeing the back of the trailer sitting on the road, Mr. Stanley eased his patrol car around it. (He had no trouble stopping in time.) When he saw there had been a collision, Mr. Stanley parked on the shoulder of the southbound lane and turned on his flashing blue lights. Mr. Ritter, who had stopped his truck after the impact and jumped out of his cab, asked Mr. Stanley if he should move the truck out of the road. Mr. Stanley told him to do so. Mr. Ritter then backed up a foot or two, disengaging the trailer from the Kennedy car, and pulled the entire rig onto the shoulder of the northbound lane. He left his lights on, as Mr. Stanley told him to.

Some ten or fifteen minutes after the accident, Mr. Joe R. Woods, driving his car north on State Route 95 at around 30 or 35 miles per hour, saw the headlights of the truck on the shoulder to his right and the blue lights of the patrol car on the opposite shoulder. He did not see the Kennedy vehicle in the middle of the road until he had gone past the headlights of the truck. He slammed on his brakes when he saw the Kennedy car, but could not avoid hitting it. Mr. Womack was still in the car.

Mr. Ritter subsequently admitted that he had caused the accident because he had been blocking the road. Mr. Ritter said he "was going to jail," but in fact he was only fined $10 plus court costs for failure to yield the right-of-way.

An experienced truck driver who testified as an expert witness on behalf of the plaintiffs told the jury that although he did not believe Mr. Ritter should have been put in prison, it was very dangerous for him to have pulled out onto the far side of the road in the fog without using flares. There was some suggestion that it would have been possible to make the turn without going much over the center line, in which event flashing lights would have provided all the warning necessary, but the main thrust of the testimony was that Mr. Ritter ought to have remained in the restaurant parking lot until the fog had lifted.

Extensive evidence was also presented on Mr. Ritter's lack of experience as a truck driver and on the failure of Gettelfinger Farms to investigate his qualifications before hiring him. Mr. Ritter, a married man in his early thirties, had a 9th grade education and had spent fifteen years working in service stations and at odd jobs. He had a long-time friend named Larry Goode, a truck driver by trade, who had allowed Mr. Ritter to ride with him, off and on, for several years, and who had worked with Mr. Ritter to teach him to drive a truck. Federal regulations require that anyone in the cab of a truck "be certified and capable of driving," according to Mr. Goode's testimony, and in 1981 Mr. Goode had signed a certificate of qualification attesting to Mr. Ritter's ability to drive. Mr. Goode subsequently gave Mr. Ritter a second certificate, with an expiration date subsequent to the date of the accident. Mr. Goode let Mr. Ritter drive a total of between 700 and 1000 miles over a period of about three months prior to the accident in 1983. Mr. Goode sometimes slept while Mr. Ritter was driving. Both men had log books, and when Mr. Goode drove more than the legal limit, the excess time would apparently be logged to Mr. Ritter. Mr. Ritter would take over the driving when the men approached weigh stations where log books might be checked.

In 1982 Mr. Goode got Mr. Ritter a job spotting trailers at a General Electric facility, but other drivers had to help Mr. Ritter do the work and he was soon released from the job.

In August of 1983 Mr. Ritter applied for a job at Victory Freightways and was given a road test, which he failed. The person who administered the test could not remember the reason Mr. Ritter did not pass the test, but Mr. Ritter testified that it was because he missed a gear in shifting gears on a tractor that had a number of forward speeds.

Two months later both Mr. Goode and Mr. Ritter went to Gettelfinger Farms and

filled out job applications. Mr. Gettelfinger testified that Mr. Goode told him Mr. Ritter, although short on experience, could safely handle a tractor-trailer, but Mr. Goode testified that no such conversation occurred, that he did not feel Mr. Ritter was qualified, and that he had lied when he certified Mr. Ritter as qualified. There is also a conflict in the evidence as to whether the men were given written open-book examinations before being hired.

Both men were called to work at the same time, and each man was given a truck to drive. No road tests were administered as far as they knew, but Mr. Gettelfinger testified that he followed Mr. Ritter in a pickup truck for 10 to 15 miles to check on Mr. Ritter's driving. Mr. Goode disputed this. It is clear, in any event, that Mr. Ritter drove the Gettelfinger truck for several thousand miles prior to the accident; that he and Mr. Goode "ran together" during the first week or ten days of their employment, staying no more than twenty miles apart from one another; and that Mr. Ritter had no mishap during that time. He did have a minor accident the day before the collision with which we are concerned here; it was occasioned, he testified, by someone cutting too sharply in front of him and then stopping at a red light.

Some weeks after the major accident Mr. Ritter had an accident in Texas. He told Gettelfinger and the state troopers that a deer had run in front of him, but Mr. Goode testified that Mr. Ritter said he had really fallen asleep at the wheel.

The punitive damage claims against Gettelfinger Farms were submitted to the jury under the theory of respondeat superior (as is permissible, under Tennessee law, where the agent's conduct could justify a punitive damage award against the principal) and under the theory that the accident had been caused by gross negligence in the entrustment of the truck to an incompetent driver. The jury's verdict was a general one, making it impossible to tell which theory (or theories) the jury accepted in assessing punitive damages against Gettelfinger Farms as well as against the truck driver.

## II

■ Summarizing Tennessee case law going back to the last century, the Tennessee Supreme Court has said that punitive damages

"are awarded in cases involving fraud, malice, gross negligence or oppression, *Knoxville Traction Co. v. Lane*, 103 Tenn. 376, 53 S.W. 557 (1899); or where a wrongful act is done with a bad motive or so recklessly as to imply a disregard of social obligations, *Stepp v. Black*, 14 Tenn.App. 153 (1931); or where there is such willful misconduct or entire want of care as to raise a presumption of conscious indifference to consequences. *Honaker v. Leonard*, 325 F.Supp. 212 (E.D. Tenn.1971)." *Inland Container Corp. v. March*, 529 S.W.2d 43, 45 (Tenn.1975).

It is only in cases involving this kind of egregious misconduct that punitive damages may be awarded. *Johnson v. Husky Industries, Inc*, 536 F.2d 645, 650 (6th Cir. 1976); *Cathey v. Johns-Manville Sales Corp.*, 776 F.2d 1565, 1570 (6th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986). Intended to inflict punishment on the wrongdoer rather than to make the injured party whole (which is what compensatory damages are supposed to do, insofar as possible), punitive damages are based "upon the oppression of the party who does the injury." *Cathey*, 776 F.2d at 1570, citing *Lazenby v. Universal Underwriters Insurance Co.*, 214 Tenn. 639, 642, 383 S.W.2d 1, 4 (1964). Tennessee views punitive damages as "private fines," *Dykes v. Raymark Industries, Inc.*, 801 F.2d 810, 814 (6th Cir.1986), citing *Huckeby v. Spangler*, 563 S.W.2d 555 (Tenn.1978), and this quasi-criminal punishment is not to be imposed for mere negligence or want of care. To do so—particularly when the dollar amount of the "fine" is measured in the millions—could raise "important issues" under the United States Constitution. See *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. ——, ——, 106 S.Ct. 1580, 1589, 89 L.Ed.2d 823, 837 (1986).

The standards for determining whether the wrongdoer's conduct is sufficiently oppressive to justify an award of punitive damages have been characterized as "confusing and devoid of any effective definition." Sales & Cole, "Punitive Damages: A Relic That Has Outlived Its Origins," 37 Vand.L.Rev. 1117, 1137 (1984). Unless the federal courts are prepared to hold punitive damages unconstitutional, however, or hold that they cannot be imposed without according the defendant some or all of the safeguards peculiar to criminal proceedings—neither of which courses is urged on us here—federal courts must apply the state-created standards as best they can, limiting any recovery to compensatory damages where liability is based on garden-variety negligence (see, *e.g., Williams v. Union Carbide Corp.,* 790 F.2d 552 (6th Cir.1986), applying Arkansas law), and permitting the jury to consider awarding both punitive and compensatory damages where the defendant's misconduct manifests the kind of *mens rea* that makes it reasonable for the government not only to require payment of full compensation, but to exact retribution as well.

The two Tennessee decisions that come closest to suggesting Mr. Ritter could properly be found guilty of gross negligence or reckless misconduct in the case at bar are *Inter-City Trucking Co. v. Daniels,* 181 Tenn. 126, 178 S.W.2d 756 (1944) and *Garner v. Maxwell,* 50 Tenn.App. 157, 360 S.W.2d 64 (1961). Both cases involved trucks that were left parked on the highway at night, without adequate warning devices, while the drivers took their ease elsewhere. In each instance the truck driver was guilty of more than a momentary lapse of judgment, and in neither case did punitive damages, as such, play a significant role in the decision.

*Daniels* was a wrongful death case in which the decedent's widow recovered judgment, after a $2500 remittitur, for $6000. There was no award of punitive damages; only because of the defendant trucking company's attempt to rely on a contributory negligence defense did the question of "gross negligence" on the part

of the truck driver arise. Under Tennessee law, contributory negligence on the part of the plaintiff's decedent would have meant that the widow and her three minor children could have recovered nothing—not even the modest compensatory damages awarded in the trial court—unless the truck driver (who, incidently, had no driver's license) could be said to have been guilty of gross negligence. Perhaps it is not too surprising that the Tennessee Supreme Court was able to discern gross negligence. In the first place, the truck driver had been guilty of negligence per se in failing to comply with a Tennessee statute requiring three lighted flares or pot torches to be placed around a vehicle parked on the highway at night. The truck driver did claim to have set out the required pot flares, but instead of standing by to keep them burning, he went into town to seek comfort and protection from the cold and remained away for at least an hour and a half. The flares (if they had been placed at all) went out, and the plaintiff's decedent was killed as a result. Likening the truck driver's attitude to that of a person who is guilty of criminal negligence, the court allowed the $6000 compensatory damage award to stand.

In *Garner v. Maxwell,* 360 S.W.2d 64, *supra,* a truck driver had left his disabled tractor-trailer outfit parked on the highway, at night, for about four hours. The truck driver had turned off the lights of the truck to save the battery and had gone home to bed, leaving the rig unattended and without the statutorily required three flares or three reflectors. The truck driver made no effort to employ a wrecker to get the tractor-trailer off the highway. A member of the Tennessee Highway Patrol ran his automobile into the tractor-trailer at about 12:30 a.m. A jury returned a verdict awarding the patrolman $21,000 for compensatory damages and $400 for punitive damages. The Tennessee Supreme Court affirmed a judgment entered on this verdict, expressing the view that the truck driver had been guilty of such gross negligence as to deprive him and his partners of

the right to rely on the defense of contributory negligence. The court was not impressed by the defendants' contention that the facts did not justify a charge on the subject of gross negligence, but could not decide that issue on appeal, under Tennessee procedure, because the question had not been presented in the defendants' motion for new trial.

In the case at bar, as was not true in *Daniels* and *Garner*, the jury's award of substantial compensatory damages will be allowed to stand whether or not the defendants are deemed to have been guilty of gross negligence. And passing, for the moment, the negligence of the employer, Gettelfinger Farms, we may say that the conduct of the truck driver, Mr. Ritter, while it had tragic consequences, does not seem to bespeak the "conscious indifference to consequences" manifested in the actions of the truck drivers in *Daniels* and *Garner*. Unlike the truck drivers in those cases, Mr. Ritter did not turn off the lights of his truck and did not abandon his truck on the highway to seek personal comfort indoors. What he did, essentially, was pull his truck slowly onto a rural highway where, despite the fog, his lights could unquestionably be seen by the drivers of other vehicles from far enough away for them to stop without running into him. Mr. Ritter's failure to realize that other drivers might be confused by the position of his headlights doubtless represented poor judgment and lack of ordinary care, but that is not the stuff of which million-dollar-plus punitive damages awards are made—at least not in Tennessee.

A good example of the kind of reckless misconduct that can justify substantial punitive damages under Tennessee law may be found in *Sakamoto v. N.A.B. Trucking Co., Inc.*, 717 F.2d 1000 (6th Cir.1983), a diversity wrongful death action where this court affirmed an award of punitive damages against a truck driver and his employer on account of an accident that occurred on Interstate Highway 75. The truck driver, an habitual user of amphetamines, had been without sleep for more than 40 hours. A new tractor had been brought to him following a breakdown, and after hitching up his trailer he decided to have breakfast at a restaurant located behind him on the interstate highway. Instead of going on to the next exit, the truck driver attempted to turn his rig around on the interstate itself, with a view to driving back the wrong way to an interchange he had passed before his breakdown. The tractor-trailer got stuck midway through the turn, and shortly thereafter the plaintiff's decedent slammed into it. Citing *Richardson v. Gibalski*, 625 S.W.2d 715 (Tenn.Ct.App.1979), for the proposition that under Tennessee law "it takes something far greater than lack of ordinary care to sustain an award for punitive damages," this court concluded that there was sufficient evidence of gross negligence to justify submission of the punitive damages issue to the jury.

We think that the degree of Mr. Ritter's negligence is more like that of the defendant in *Southeastern Aviation, Inc. v. Hurd*, 209 Tenn. 639, 355 S.W.2d 436 (1962), a wrongful death action arising from an airplane crash. The pilot of a DC-3 on a scheduled flight from Memphis to Nashville noticed that the Automatic Direction Finder with which the plane was equipped was malfunctioning. The ADF (a radio compass) enables a pilot to make an approach and landing when weather conditions prevent visual contact with the ground. When the pilot landed the plane at the Nashville Airport, he alerted the successor pilot who was to fly the plane on to the Tri-City Airport that the ADF was malfunctioning. The second pilot elected to try to reach his ultimate destination notwithstanding this fact, and notwithstanding that the plane had only one ADF and not two, as most up-to-date aircraft did. As the plane approached the Tri-City Airport, visual contact with the ground was impossible due to clouds, light snow, and fog—conditions not unusual for that time of year. When the pilot attempted to make his approach, he radioed to the tower operator that he was "having trouble" with the ADF and that he "didn't pick up the outer marker," a ground radio facility which would

indicate his location. The plane then flew approximately 20 miles beyond the airport and crashed into the side of Holston Mountain, killing the plaintiff's decedent.

The Tennessee Supreme Court held there was sufficient evidence to support the jury's verdict that the defendant airline was "guilty of negligence in respect of the condition of its plane and the manner of its operation," *id.* at 662, 355 S.W.2d at 446, but also held that there was "no evidence that [the defendant] was guilty of such gross and wanton negligence as to justify any award for punitive damages." *Id.* at 664, 355 S.W.2d at 446–47. In setting aside an award of punitive damages in the relatively modest amount of $5,000, the court said that

> "While petitioner's (defendant's) pilot and First Officer were negligent in undertaking to fly a plane not airworthy, and in their manner of operation of the plane, there is nothing to show such gross and wanton negligence on their part as to evince conscious indifference to consequences. It must be remembered that their own lives were at stake, and they evidently expected to make a safe landing."

*Id.* at 665, 355 S.W.2d at 447.

So it was in the present case; in undertaking to pull out onto the highway in the fog, risking injury to himself and damage to the truck, Mr. Ritter evidently expected to make a safe turn. His negligence was not so gross or wanton as to evince conscious indifference to the consequences of his action. On the facts of this case, we do not believe the Tennessee Supreme Court would sustain an award of punitive damages against Mr. Ritter.

### III

■ Insofar as the award of punitive damages against Gettelfinger Farms is concerned, our conclusion that Mr. Ritter was not guilty of gross or wanton negligence means that his employer cannot be held liable for punitive damages on a respondeat superior theory. Conceptually, however, gross negligence in the entrustment of the tractor-trailer to a known incompetent could justify an award of punitive damages even without gross negligence on the part of the driver himself. See Tenn.Code Ann. § 20–9–502 (1980); *Tracy v. Finn Equipment Co.,* 290 F.2d 498 (6th Cir.), *cert. denied,* 368 U.S. 826, 82 S.Ct. 47, 7 L.Ed.2d 30 (1961). On the record of this case, we do not believe that the negligence of Gettelfinger Farms in entrusting its truck to Mr. Ritter can support an award of punitive damages.

Evidence presented at trial indicated that Mr. Ritter was not properly certified to drive the truck. The jury reasonably could have found that Mr. Ritter did not pass either the required road test or a written test prior to his employment by the Gettelfingers. Mr. Ritter did, however, present a competency certificate signed by Mr. Goode, an experienced driver, and the fact that Mr. Ritter drove the Gettelfinger truck for several thousand miles without significant incident shows that Mr. Ritter did, in fact, know how to drive. The accident in this case did not result from inability to shift gears or maneuver the truck; it resulted from a lapse of judgment that no pre-employment test would have been likely to predict. Negligent though Gettelfinger Farms may have been in hiring Mr. Ritter, the entrustment of a $200,000 tractor-trailer to an apparently responsible driver does not bespeak the kind of wanton misconduct necessary to support a punitive damage award.

### IV

Rejecting two subsidiary claims advanced by the defendants, we do not find the compensatory damage awards excessive, nor do we believe that the district court abused its discretion in failing to grant the defendants a continuance. We shall therefore affirm the judgment of the district court insofar as it awards compensatory damages against Mr. Ritter and Gettelfinger Farms.

### V

The magistrate granted the third-party defendants' motions for summary judg-

ment in the third-party action against Mr. Kennedy and Mr. and Mrs. Woods because, under Tennessee law, "[t]here is no right of contribution in favor of any tort-feasor who has intentionally caused or contributed to the injury or wrongful death." Tenn.Code Ann. § 29–11–102(c) (1980). Equating gross negligence with intentional infliction of injury or death, the magistrate held that this statutory provision precludes grossly negligent tortfeasors from obtaining contribution or indemnity. We need not address that issue, having determined that as a matter of law the third-party plaintiffs were not guilty of gross negligence. Simple negligence does not bar contribution or indemnity among joint tortfeasors.

■ As the magistrate has held, the third-party plaintiffs may not recover for damage to the truck. Although it is unclear whether federal or state collateral estoppel rules should be applied in determining the preclusive effect, in the third-party action, of the negligence finding in the trial of the wrongful death and personal injury actions, Tennessee and federal law would dictate the same result here. In cases governed by federal law, collateral estoppel may clearly be invoked in situations such as that presented here. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Although the Tennessee Supreme Court has not precisely so ruled, it has indicated in dicta that it would follow the rationale of the Supreme Court (and the courts of other states) in holding that collateral estoppel may be used defensively by one who was not a party to the prior suit. See *Cotton v. Underwood,* 223 Tenn. 122, 131–32, 442 S.W.2d 632, 637 (1969); see also *Fourakre v. Perry,* 667 S.W.2d 483 (Tenn.App.1983). Whether federal law or Tennessee law is applied, therefore, the third-party plaintiffs in this case are collaterally estopped from relitigating the issue of their own negligence. "Under Tennessee law contributory negligence is ordinarily a complete bar to a plaintiff's recovery." *McElroy v. Boise Cascade Corp.,* 632 S.W.2d 127, 136 (Tenn.App.1982). Therefore, because the

accident was found to have been caused by the third-party plaintiffs' negligence, Gettelfinger Farms is precluded from recovering from Mr. Kennedy for damage to its tractor-trailer.

## VI

■ Finally, Mr. and Mrs. Woods have moved to dismiss the appeal as to them on the basis of their settlement agreement with Mrs. Womack. Tennessee Code Annotated § 29–11–105 (1980) provides,

"(a) When a release or covenant not to sue or not to enforce judgment is given in good faith to one (1) of two (2) or more persons liable in tort for the same injury or the same wrongful death:

(1) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater; and

(2) It discharges the tort-feasor to whom it is given from all liability for contribution to any other tort-feasor."

In order for the Woods to be protected, under this statute, against a claim for contribution, the release must have been "given in good faith." The third-party plaintiffs contend that the release in this case was not given in good faith. As evidence of that fact, they point out that although Mrs. Womack was awarded $175,963.02 in compensatory damages and $500,000 in punitive damages, the settlement with the Woods was in the amount of only $2,500. Moreover, that settlement was entered into after entry of judgment, when the damage amounts were already determined.

Whether a release was given in good faith is a question of fact to be determined first by the trier of fact. *Florow v. Louisville & Nashville Railroad Co.,* 502 F.Supp. 1 (M.D.Tenn.1979). The magistrate will have an opportunity to consider this question on remand.

Because Tenn.Code Ann. § 29–11–105 does not govern indemnity, we must look elsewhere to determine whether the third-party plaintiffs may still assert a cause of action against the Woods for indemnity. In *Southern Railway Co. v. Foote Mineral Co.*, 384 F.2d 224, 226–27 (6th Cir.1967), this court approved the following jury instruction:

"Under the Tennessee law a person who is held liable for negligence to one party may be indemnified or may recover indemnity in the amount of his liability from a third-party, if he establishes that the third-party is also guilty of negligence proximately causing or contributing to the cause of the accident, and that the negligence of the third-party was active negligence while his own negligence was only passive."

The instruction went on to explain that if one joint tortfeasor was guilty of active negligence, he could not recover indemnity from the other tortfeasor. *Id.* at 226. If both were guilty of active negligence, however, one could recover *contribution* from the other. *Id.* at 226–27. (Contribution is not available, as noted above, where there has been a good faith release.)

Because the magistrate granted summary judgment in favor of the Woods on the basis that one found guilty of gross negligence is not entitled to indemnity or contribution, and thus did not consider the active/passive negligence issue, that issue, too, should be addressed by the magistrate on remand.

We AFFIRM the award of compensatory damages, REVERSE the award of punitive damages, and REMAND the third-party action for further proceedings in accordance with this opinion.